**WESTINGHOUSE ELECTRIC CORPORATION; and Westinghouse International Projects Company, Petitioners,**

v.

**The REPUBLIC OF THE PHILIPPINES; and National Power Corporation, Respondents,**

**and**

**Honorable Dickinson R. Debevoise, United States District Judge, Nominal Respondent.**

No. 90–5920.

United States Court of Appeals, Third Circuit.

Argued Jan. 25, 1991.

Decided Dec. 19, 1991.

Richard W. Clary (argued), David Boies, Cravath, Swaine & Moore, New York City, Raymond M. Tierney, Jr., William D. Sanders, Shanley & Fisher, P.C., Morristown, N.J., Jerome J. Shestack, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Jonathan D. Schiller, Donovan, Leisure, Rogovin, Huge & Schiller, Washington, D.C., for petitioner.

David J. Cynamon (argued), Mark Augenblick, P.C., Ellen M. Jakovic, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Paul A. Rowe, Alan S. Naar, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Woodbridge, N.J., Reichler, Appelbaum & Wippman, Clifford & Warnke, Washington, D.C., for respondent.

Before BECKER, HUTCHINSON, Circuit Judges and ATKINS, District Judge *.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This petition for a writ of mandamus requires us to resolve an important issue that has divided the circuits: whether a party that discloses information protected by the attorney-client privilege and the work-product doctrine [1] in order to cooperate with a government agency that is investigating it waives the privilege and the doctrine only as against the government, or waives them completely, thereby exposing the documents to civil discovery in litigation between the discloser and a third party. The issue arises in an action brought by the Republic of the Philippines (the "Republic") and its National Power Corporation ("NPC") against Westinghouse Electric Corporation and its wholly-owned subsidiary, Westinghouse International Projects Company (collectively "Westinghouse"). The Republic and the NPC allege that Westinghouse obtained a large power plant contract in the Philippines by bribing a henchman of former President Ferdinand Marcos. Their complaint charges that Westinghouse and others tortiously interfered with and conspired to tortiously interfere with the fiduciary duties that President Marcos owed to the Philippine people and to the NPC. The complaint seeks damages on a variety of theories.

During discovery, the Republic sought certain documents generated during an internal investigation conducted by Westinghouse's outside counsel. The investigation was a response to an investigation by the Securities and Exchange Commission ("SEC") into allegations that Westinghouse had obtained contracts by bribing foreign officials. Westinghouse disclosed the documents in question to the SEC in order to cooperate with the agency's investigation. Westinghouse later disclosed the same documents, as well as other, related documents, to the Department of Justice ("DOJ") in order to cooperate with an investigation conducted by the DOJ. Westinghouse's petition for mandamus follows the district court's ruling that the disclosures effected a complete waiver of the attorney-client privilege and the work-product doctrine, thus rendering the documents available to the Republic in discovery.

---

* The Honorable C. Clyde Atkins, Senior United States District Judge for the Southern District of Florida, sitting by designation.

1. Although some writers refer to a work-product "privilege," we prefer the term "doctrine," for the doctrine encompasses both a limited immunity from discovery and a qualified evidentiary privilege. See *United States v. Arthur Young & Co.,* 465 U.S. 805, 817–19, 104 S.Ct. 1495, 1502–

04, 79 L.Ed.2d 826 (1984) (distinguishing work-product immunity from accountant-client testimonial privilege and rejecting both); *Upjohn Co. v. United States,* 449 U.S. 383, 397–402, 101 S.Ct. 677, 686–89, 66 L.Ed.2d 584 (1981) (referring to work-product doctrine distinct from attorney-client privilege). See generally Sherman L. Cohn, *The Work Product Doctrine: Protection, Not Privilege,* 71 Geo.L.J. 917 (1983).

For the reasons that follow, we hold that by disclosing documents to the SEC and to the DOJ, Westinghouse waived both the attorney-client privilege and the work-product doctrine with respect to those documents. We also hold that we lack jurisdiction to review Westinghouse's request for a writ of mandamus commanding the turnover of certain documents that the Republic and the NPC shared with the DOJ pursuant to an agreement for mutual legal assistance.

## I. FACTUAL BACKGROUND [2]

### A. *The Contract*

In the mid–1970s, Westinghouse sought and obtained the prime contract to construct the first Philippine nuclear power plant and to ready it for use on a turnkey basis.[3] As part of Westinghouse's efforts to procure the contract, it retained as its "special sales representative" Herminio T. Disini, a Philippine businessman and close friend and associate of then-President Marcos. Disini agreed to promote Westinghouse's interests with the NPC, which was the Philippine government agency responsible for electric power generation and for contract negotiations on the power plant project. Westinghouse received the prime contract for the power plant. Several years later, newspaper articles appeared in the Philippine and American press, charging that the company had procured the contract by passing bribes to Philippine government officials through Disini.

### B. *The SEC Investigation and Westinghouse's Disclosures Pursuant Thereto*

In January 1978, shortly after the appearance of the press reports concerning Westinghouse's alleged misconduct in connection with the Philippine nuclear plant, the SEC commenced an investigation into whether Westinghouse had violated United States securities laws by making illegal payments to obtain the contract. In March 1978, Westinghouse retained the law firm Kirkland & Ellis to conduct an internal investigation into whether company officials had made improper payments. In the course of the internal investigation, which lasted until November 1978, Kirkland & Ellis produced two letters reporting its findings.

The law firm, at the behest of Westinghouse, showed the SEC investigators one of the letter reports and, in addition, orally presented its findings to the agency. Kirkland & Ellis did not supply the SEC with any of the documents underlying the presentation and the report, and the SEC agreed not to retain the report. Westinghouse asserts that in disclosing to the SEC the results of the Kirkland & Ellis investigation, it relied upon the SEC's confidentiality regulations,[4] as well as the Eighth Circuit's decision in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (en banc), as creating a reasonable expectation of continuing confidentiality for the materials shown to the SEC.

In 1980, the SEC served subpoenas on Disini, based on allegations that he had engaged in illegal activities relating to the award of the prime contract for the power

**2.** A more detailed account is found in the district court's two previous opinions in this case. See *Republic of the Philippines v. Westinghouse Electric Corp.*, 714 F.Supp. 1362, 1364–67 (D.N.J. 1989), and *Republic of the Philippines v. Westinghouse Electric Corp.*, 132 F.R.D. 384, 385–86 (D.N.J.1990). See also *Republic of the Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653 (3d Cir.1991) (denying stay pending appeal of district court order directing the unsealing of material filed under seal in connection with Westinghouse's motion for summary judgment in this action).

**3.** A turnkey project is one in which the contractor is engaged to design, construct, and other-

wise ready the plant for operation and then to turn over the key to the owner. See *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 424–25 (E.D.Pa.1975).

**4.** The SEC regulations in effect at the time provided that "[i]nformation or documents obtained by the [SEC] in the course of any investigation or examination, unless made a matter of public record, shall be deemed non-public." 17 CFR § 203.2 (1978). The regulations further provided that information or documents obtained in the course of an investigation would be deemed and kept confidential by SEC employees and officers unless disclosure was specifically authorized. 17 CFR § 240.0–4 (1978).

plant. Thereafter, counsel for Westinghouse and for Disini entered into a joint defense agreement, under which they agreed to exchange—and to maintain confidentiality with respect to—privileged information and work product. Counsel for Disini, the law firm Baker & McKenzie, subsequently began negotiating with the SEC on his behalf. As a result, the accounting firm Coopers & Lybrand was retained to perform audits tracing the funds that Westinghouse had paid to Disini. Coopers & Lybrand summarized the results of these audits in a report that Disini made available to the SEC, which in turn agreed to keep the contents of the report confidential and neither to copy nor to retain it. Pursuant to their joint defense agreement, Disini provided Westinghouse with a copy of the Coopers & Lybrand report. The SEC discontinued its investigation of Westinghouse in April 1983.

## C. The Department of Justice Investigations and Westinghouse's Disclosures Pursuant Thereto

In 1978, the DOJ began to investigate Westinghouse. The DOJ's investigation explored whether Westinghouse had made illegal payments to obtain contracts not only in the Philippines, but also in other countries. A grand jury subsequently issued a subpoena, with which Westinghouse complied, requesting that the company produce certain privileged documents (not at issue here) subject to the confidentiality protections of FRCrP 6(e). The DOJ's investigation ended when Westinghouse entered into a plea agreement concerning payments that the company admitted making in order to obtain business in Egypt.

In 1986, after Marcos was deposed as President of the Philippines, the DOJ reactivated its 1978 investigation of Westinghouse's conduct in procuring the turnkey contract on the Philippine nuclear plant. A grand jury subpoenaed the Kirkland & Ellis letters reporting the results of Westinghouse's internal investigation, as well as all documents accumulated in connection with that investigation. In an effort to preserve its attorney-client privilege and work-product protection, Westinghouse moved to quash the subpoena. After entering into a confidentiality agreement with the DOJ, subsequently memorialized in a stipulated court order entered in the district court for the Western District of Pennsylvania, Westinghouse disclosed the subpoenaed documents to the grand jury. According to Westinghouse, this agreement, which was itself confidential, provided

> that the [DOJ] review at Westinghouse counsel's office (but not keep copies of) attorney-client privileged and work product protected materials in the Kirkland & Ellis files, that the information contained therein would not be disclosed to anyone outside of the [DOJ], and that such review of the Kirkland & Ellis documents would not constitute a waiver of Westinghouse's work product and attorney-client privileges.

See 132 F.R.D. at 385–86. The DOJ's investigation is apparently still ongoing (at least the record does not indicate the contrary).

## D. The Republic's Investigation

In 1987, the Republic initiated its own investigation into the contract-procurement activities of Westinghouse and a second company, Burns & Roe Enterprises, Inc., a New Jersey corporation that had obtained the architecture and engineering contract on the power plant project and that also had secured the services of Disini as a "special sales representative." The Republic's Presidential Commission on Good Government (the "PCGG"), the government entity charged with investigating Westinghouse's and Burns & Roe's conduct, subsequently entered into an agreement with the DOJ, denominated the "Agreement on Procedures for Mutual Legal Assistance" (the "Agreement").

The Agreement, which is still in force, provides that the PCGG and the DOJ will exercise their best efforts to provide one another with information and materials relevant to their concurrent investigations that can be used in any subsequent criminal, civil, and administrative proceedings. Under the Agreement, the PCGG and the DOJ also have undertaken to maintain con-

fidentiality as to all correspondence concerning shared information.

## II. PROCEDURAL HISTORY

### A. *The Current Proceedings*

In December 1988, the Republic and the NPC brought suit against Westinghouse and Burns & Roe in the district court for the District of New Jersey. In a fifteen-count complaint, the Republic and the NPC alleged breach of contract, fraud, negligence, tortious interference with fiduciary relationship, civil conspiracy, violation of the federal Racketeer Influenced and Corrupt Organizations Act, and antitrust violations. The complaint also included a number of pendent state claims.

Pursuant to a clause in its contract with the NPC, Westinghouse moved to stay the action pending arbitration. Relying on *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), as well as other Supreme Court precedents, the district court stayed all claims except (1) the claim that Westinghouse, along with Burns & Roe, tortiously interfered with Marcos's performance of the fiduciary duties that he owed to the Philippine people and (2) the claim that the two defendants conspired to prevent Marcos from performing his fiduciary duties to the Philippine people and to the NPC.

In the course of discovery on these two claims, the Republic requested that Westinghouse produce the documents that it had made available to the SEC and to the DOJ. Westinghouse objected to this discovery request, invoking both the work-product doctrine and the attorney-client privilege. Westinghouse sought, in turn, to discover documents that the Republic had shared with the DOJ under the Agreement. The Republic resisted, asserting that these documents were protected by the work-product doctrine.

The magistrate judge supervising discovery concluded that Westinghouse had waived its attorney-client privilege regarding the documents it disclosed to the SEC and to the DOJ because at least in adver-

sarial situations, once disclosure has been made to a government agency, any privilege is lost, notwithstanding any confidentiality agreement between Westinghouse and the government. He therefore ruled that Westinghouse must identify and produce all documents disclosed to the DOJ and to the SEC, although he invited Westinghouse to appeal this ruling to the district court.

The magistrate judge further held that the documents that Westinghouse had requested from the Republic were protected by the work-product doctrine and therefore were not subject to discovery. The magistrate judge reasoned that, because the DOJ is an *ally* of the Republic, the latter, by sharing information with the agency, had not subverted the principles of the adversary system in which the work-product doctrine is grounded. The magistrate judge also reasoned that the sharing of information between the DOJ and the Republic was "highly unlikely" to lead to the disclosure of the information to adversaries.

### B. *The District Court Opinion*

The district court affirmed both rulings. First, the court observed that although the attorney-client privilege ordinarily is waived by the disclosure of privileged information to a third party, a circuit split exists over whether waiver occurs when the disclosure is made to the government. Because this court has not previously resolved the issue, the district court had to choose between the Eighth Circuit's holding in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1977) (en banc), that the attorney-client privilege is waived only with respect to the government, and the D.C. Circuit's position, articulated in *Permian Corp. v. United States*, 665 F.2d 1214 (D.C.Cir.1981), that the disclosure of privileged information to any third party, including the government, destroys the privilege.

In *United States v. Rockwell International*, 897 F.2d 1255 (3d Cir.1990), we expressly reserved the question whether the disclosure of protected information effects a complete, or only a selective, waiver of

the attorney-client privilege. The district court determined, however, that our earlier decision in *In re Grand Jury Investigation (Sun Co.)*, 599 F.2d 1224 (3d Cir.1979), effectively had resolved the issue for two reasons. First, the court concluded that our explicit rejection of *Diversified's* reasoning regarding the appropriate scope of the attorney-client privilege in the corporate context in *Sun Co.* implicitly rejected *Diversified's* reasoning in all contexts. Second, the court concluded that because we had sought in *Sun Co.* to enhance the development of a *uniform* rule concerning the application of the attorney-client privilege to corporate communications, we also would adopt the *majority* rule on whether the disclosure of privileged information to the government vitiates the privilege. The court took the D.C. Circuit's position to represent the majority rule that we would adopt.

The district court also held that the documents that Westinghouse had disclosed to the SEC and to the DOJ were not protected by the work product doctrine set forth in FRCP 26(b)(3). Citing the Supreme Court's decision in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), as well as this court's decision in *Sun Co.*, the district court emphasized that the work-product doctrine is not absolute and may be waived. 132 F.R.D. at 388–89. Noting that this court had not yet indicated the circumstances under which the work-product doctrine is waived, id. at 389, the court looked to the opinions of other courts, id at 389–90.[5] On the basis of those opinions, the district court concluded that "[s]ince the work-product privilege doctrine is based on maintaining a healthy adversarial system, ... once the privileged information is disclosed to any adversary the privilege is destroyed." Id. at 390. Implicitly determining that the SEC and the DOJ were Westinghouse's adversaries, the court held that by voluntarily disclosing information and documents to these agencies,

Westinghouse had waived the right to assert the protection of the doctrine.

In contrast, the district court held that because the DOJ and the Republic are litigation "allies," their mutual disclosure of information under the Agreement did not give rise to a corresponding waiver of work-product protection. Id. at 390–91. The court noted that this holding was consistent with its decision in *Shulton, Inc. v. Optel Corp.*, 1987 WL 19491, 1987 U.S. Dist. LEXIS 10097 (DNJ). 132 F.R.D. at 390. Following *Shulton*, the court reasoned that "[d]isclosing information to any ally may strengthen, rather than destroy, the adversary process, as allies who fortify their cases against their mutual adversary have a greater chance of defeating that adversary." Id. 132 F.R.D. at 391.

The district court subsequently denied Westinghouse's motions for reargument or, in the alternative, for certification pursuant to 28 USC § 1292(b). The court, however, concluded that Westinghouse had raised "substantial question[s]" concerning the application of the attorney-client privilege and the work-product doctrine "which should be resolved by the Third Circuit in the last instance rather than myself." Therefore, the court granted Westinghouse's motion for a stay pending efforts to review its disclosure order.

## III. APPELLATE JURISDICTION

In its petition for the extraordinary writ of mandamus, Westinghouse asks that we set aside both aspects of the district court's order, which held that (1) Westinghouse had waived the attorney-client privilege and work-product doctrine regarding the documents it disclosed to the SEC and to the DOJ and that (2) the Republic had not waived the work-product doctrine regarding the documents it disclosed to the DOJ pursuant to the Agreement for Mutual Legal Assistance. As a threshold question, we must decide whether mandamus may be used as a means of reviewing those orders.

---

5. The decisions that the district court looked to include *In re Chrysler Motors Corporation Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir.1988), *In re Subpoenas Duces Te-* *cum*, 738 F.2d 1367 (D.C.Cir.1984), *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982), and *Chubb Integrated Systems v. National Bank of Washington*, 103 F.R.D. 52 (D.D.C.1984).

Mandamus is authorized by the All Writs Act, 28 U.S.C. § 1651(a) (1988), which provides:

The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The language of section 1651 itself establishes a prerequisite for our jurisdiction: because the writ must be "in aid of" *our* jurisdiction, the case must be one that lies within "some present or potential exercise of appellate jurisdiction." *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 591 (3d Cir. 1984) (quoting *United States v. RMI Co.*, 599 F.2d 1183, 1185 (3d Cir.1979)). See also 16 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3932 at 185 (West 1977) ("Wright & Miller"). That prerequisite plainly is satisfied in this case. Given our jurisdiction to review final judgments under 28 U.S.C. § 1291, it is clear that the underlying case may at some future time come within the court's appellate jurisdiction. *Bogosian*, 738 F.2d at 591; see also *McClellan v. Carland*, 217 U.S. 268, 30 S.Ct. 501, 54 L.Ed. 762 (1910) (writs of mandamus may issue in aid of appellate jurisdiction yet to be acquired).

Another prerequisite for mandamus jurisdiction emanates from the final judgment rule: mandamus must not be used as a mere substitute for appeal. 16 Wright & Miller, § 3932 at 185. That prerequisite is satisfied in this case with respect to the order compelling Westinghouse to produce the documents it disclosed to the SEC and to the DOJ. Westinghouse "ha[s] no other adequate means to attain the relief [it] desires," *Sporck v. Peil*, 759 F.2d 312, 314 (3d Cir.1985) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980)). "When a district court orders production of information over a litigant's claim of a privilege not to disclose, appeal after a final judgment is an inadequate remedy." *Bogosian*, 738 F.2d at 591 (citation omitted).[6]

Our jurisprudence also focuses attention on "the instructional goals of mandamus." *United States v. Christian*, 660 F.2d 892, 897 (3d Cir.1981). Review would comport with that consideration, too. This court has not previously decided the important attorney-client privilege and work-product issues presented by Westinghouse's petition. Moreover, the other courts of appeals that have addressed the issue have reached contradictory results. Compare *Diversified*, 572 F.2d 596, with *Permian*, 665 F.2d 1214.

Therefore, we hold that Westinghouse's petition to set aside the district court's order directing Westinghouse to disclose the documents that it revealed to the government falls, at the threshold, within "the line of cases recognizing that mandamus may properly be used as a means of immediate appellate review of orders compelling the production of documents claimed to be protected by privilege or other interests in confidentiality." *Bogosian*, 738 F.2d at 591. See also *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1118 (3d Cir.1986) ("[M]andamus has been held to be appropriate when a failure to issue the writ would lead to the disclosure of confidential materials."). We also hold, however, that mandamus is *not* the appropriate avenue to review the district court's order *upholding* the work-product doctrine as applied to the documents the Republic shared with the DOJ. Unlike an order compelling disclosure, the effect of which is irrevocable, an order denying discovery may be reviewed on appeal from the final judgment, and, if erroneous, may be remedied by granting a new trial.

The decision to examine Westinghouse's attorney-client privilege and work-product claims at the threshold does not, however, conclude the mandamus issue, but only permits further consideration of the papers. The test for the grant of man-

---

6. An order compelling or denying discovery does not fall within the orders that may be appealed under 28 U.S.C. § 1292(a), see *Borden Co. v. Sylk*, 410 F.2d 843, 845 (3d Cir.1969), and the district court wisely exercised its discretion in rejecting Westinghouse's attempt to pursue an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

damus is rigorous indeed. As we have explained, mandamus is appropriate only in extraordinary situations, *Sporck,* 759 F.2d at 314, and the writ will be granted only where the petitioner has shown that the district court has committed a "clear error of law," id. Moreover, the petitioner has the burden of showing that its right to mandamus relief is "clear and indisputable." *Id.* We now turn to Westinghouse's attorney-client privilege and work-product claims. As our discussion will demonstrate, this rigorous test is not met here.

## IV. THE ATTORNEY–CLIENT PRIVILEGE AND THE SELECTIVE WAIVER THEORY

The central question regarding Westinghouse's attorney-client privilege claim is the validity of the celebrated and controversial selective waiver[7] theory fashioned by the Eighth Circuit in *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1978) (en banc), and resoundingly rejected by the D.C. Circuit in *Permian Corp. v. United States,* 665 F.2d 1214 (DC Cir.1981), and subsequent cases. See *In re Subpoenas Duces Tecum,* 738 F.2d 1367 (DC Cir.1984); *In re Sealed Case,* 676 F.2d 793 (DC Cir.1982). In *Diversified,* the Eighth Circuit held that disclosure of material protected by the attorney-client privilege to the SEC during a formal investigation constituted only a selective waiver of the privilege, and that therefore the material could not be discovered in subsequent civil litigation.

It is often stated that the purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients." See, for exam-

ple, *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Full and frank communication is not an end in itself, however, but merely a means to achieve the ultimate purpose of the privilege: "promot[ing] broader public interests in the observance of law and administration of justice." Id. See also Developments, 98 Harv.L.Rev. at 1644 (cited in note 7). The Supreme Court recognized this underlying rationale for the privilege long ago, when it stated:

> [The attorney-client privilege] is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.

*Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 32 L.Ed. 488 (1888) (quoted in *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682). See also Edward W. Cleary, ed., *McCormick on Evidence,* § 87 at 204 (West 1972) ("The proposition is that the detriment to justice from a power to shut off inquiry to pertinent facts in court, will be outweighed by the benefits to justice (not to the client) from a franker disclosure in the lawyer's office.").

Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly. *In re Grand Jury Investigation (Sun Co.),* 599 F.2d 1224, 1235 (3d Cir.1979); *In re Grand Jury Investigation of Ocean Transportation,* 604 F.2d 672, 675 (DC Cir.1979); *Radiant Burners, Inc. v. American Gas Association,* 320 F.2d 314, 323 (7th Cir.1963).[8] The privilege "protects *only* those disclosures—necessary to obtain informed legal

---

**7.** Although the rule in *Diversified* is often referred to as the "limited waiver rule," we prefer not to use that phrase because the word "limited" refers to two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. See Breckinridge L.

Willcox, *Martin Marietta and the Erosion of the Attorney–Client Privilege and Work–Product Protection,* 49 Md.L.Rev. 917, 922 (1990); Developments in the Law, *Privileged Communications,* 98 Harv.L.Rev. 1450, 1630–31 (1985).

**8.** Regarding the narrow construction given privileges in general, see *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990); *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980); *In re Grand Jury Investigation,* 918 F.2d 374, 383 (3d Cir.1990).

advice—which might not have been made absent the privilege." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) (emphasis added). Accordingly, voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege. *United States v. AT & T*, 642 F.2d 1285, 1299 (DC Cir.1980). As one commentator cogently explained:

> If clients themselves divulge such information to third parties, chances are that they would also have divulged it to their attorneys, even without the protection of the privilege. Thus, once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies ...

Comment, *Stuffing the Rabbit Back into the Hat: Limited Waiver of the Attorney–Client Privilege in an Administrative Agency Investigation*, 130 U.Pa.L.Rev. 1198, 1207 (1982). Consequently, it is well-settled that when a client voluntarily discloses privileged communications to a third party, the privilege is waived. See *Rockwell*, 897 F.2d at 1265. See also 8 Wright & Miller, § 2016 at 127 and n. 71; id., § 2024 at 210 (citing cases).

When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege. For example, courts have held that the client may allow disclosure to an "agent" assisting the attorney in giving legal advice to the client without waiving the privilege. 8 Wigmore, *Evidence* § 2301 at 583 (McNaughton rev. 1961); McCormick, *Evidence* § 92 at 188. Courts have also held that the client may disclose communications to co-defendants or co-litigants without waiving the privilege. See, for example, *Hunydee v. United States*, 355 F.2d 183, 184–85 (9th Cir. 1965). These exceptions are consistent with the goal underlying the privilege because each type of disclosure is sometimes necessary for the client to obtain informed legal advice.

Westinghouse in essence asks that we recognize another exception to the waiver doctrine, one designed to accommodate voluntary disclosure to government agencies. In this regard, we note preliminarily that numerous cases have applied the traditional waiver doctrine to communications disclosed to government agencies. See Note, *The Limited Waiver Rule: Creation of an SEC–Corporation Privilege*, 36 Stan.L.Rev. 789, 792 and n. 17 (1984) (citing cases finding waiver when disclosures made to various government agencies, including the IRS, the DOJ, the Department of Labor, and the SEC).

In *Diversified*, the Eighth Circuit departed from the traditional waiver doctrine by recognizing an exception for voluntary disclosures made in cooperation with SEC investigations. The court's explanation for its departure consists, in its entirety, of the following sentence:

> To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

572 F.2d at 611.[9]

In rejecting *Diversified*, the D.C. Circuit observed that it could not see how the availability of a selective waiver "would serve the interests underlying the [attorney-client privilege]." *Permian*, 665 F.2d at 1220. The court reasoned that selective waiver "has little to do with" the privilege's purpose—protecting the confidentiality of attorney-client communications in order to encourage clients to obtain informed legal assistance. Id. The court explained that while voluntary cooperation with government investigations "may be a laudable activity, ... it is hard to understand how such conduct improves the attorney-

---

9. Westinghouse cites *Byrnes v. IDS Realty Trust*, 85 FRD 679 (SDNY 1980), and *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368 (E.D.Wis.1979), as following *Diversified*. Both cases appear to have involved partial disclosures, a topic we discuss at 1426 note 13. In addition, in both cases, the court was construing Eighth Circuit precedent. We thus conclude that *Diversified* still stands alone.

client relationship." Id. at 1221. The court then advanced a second reason for rejecting the selective waiver rule, stating:

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege is not designed for such tactical employment.

Id.

We find the first part of the D.C. Circuit's reasoning persuasive. The Eighth Circuit's sole justification for permitting selective waiver was to encourage corporations to undertake internal investigations. Unlike the two widely recognized exceptions to the waiver doctrine we discussed at 1424, selective waiver does not serve the purpose of encouraging full disclosure to one's attorney in order to obtain informed legal assistance; it merely encourages voluntary disclosure to government agencies, thereby extending the privilege beyond its intended purpose. See Note, 36 Stan. L.Rev. at 804 (noting that selective waiver rule merely encourages disclosure to government agencies); Developments, 98 Harv.L.Rev. at 1645, 1647 (noting concern that selective waiver rule extends breadth of attorney-client privilege). Moreover, selective waiver does nothing to promote the attorney-client relationship; indeed, the unique role of the attorney, which led to the creation of the privilege, has little relevance to the selective waiver permitted in *Diversified*. See Note, 36 Stan.L.Rev. at 804.

The traditional waiver doctrine provides that disclosure to third parties waives the attorney-client privilege unless the disclosure serves the purpose of enabling clients to obtain informed legal advice. Because the selective waiver rule in *Diversified* protects disclosures made for entirely different purposes, it cannot be reconciled with traditional attorney-client privilege doctrine. Therefore, we are not persuaded to engraft the *Diversified* exception onto the attorney-client privilege. Westinghouse argues that the selective waiver rule encourages corporations to conduct internal investigations and to cooperate with federal investigative agencies. We agree with the D.C. Circuit that these objectives, however laudable, are beyond the intended purposes of the attorney-client privilege, see *Permian*, 665 F.2d at 1221, and therefore we find Westinghouse's policy arguments irrelevant to our task of applying the attorney-client privilege to this case. In our view, to go beyond the policies underlying the attorney-client privilege on the rationale offered by Westinghouse would be to create an entirely new privilege.

Several factors counsel against the creation of a new privilege allowing parties to disclose communications to government agencies without waiving the attorney-client privilege. First, because privileges obstruct the truth-finding process, the Supreme Court has repeatedly warned the federal courts to be cautious in recognizing new privileges. See, for example, *University of Pennsylvania*, 110 S.Ct. at 582 (cited in note 8). In addition, the Supreme Court has been "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the competing concerns but has not provided the privilege itself." Id. In 1984, Congress rejected an amendment to the Securities and Exchange Act of 1934, proposed by the SEC, that would have established a selective waiver rule regarding documents disclosed to the agency. See *SEC Statement in Support of Proposed § 24(d) of the Securities and Exchange Act of 1934*, in 16 Sec.Reg. & L.Rep. at 461 (March 2, 1984).

Moreover, although a selective waiver rule might increase voluntary cooperation with government investigations, a new privilege must "promote[ ] sufficiently important interests to outweigh the need for probative evidence." *Trammel*, 445 U.S. at 50, 100 S.Ct. at 912 (cited in note 8). We do not question the importance of the public interest in voluntary cooperation with government investigations. We have little reason to believe, however, that this interest outweighs "the fundamental principle

that 'the public ... has a right to every man's evidence.'" *University of Pennsylvania,* 110 S.Ct. at 582 (citations omitted).[10]

In addition, we do not think that a new privilege is necessary to encourage voluntary cooperation with government investigations. Indeed, no such privilege was established at the time Westinghouse decided to cooperate with the SEC and the DOJ. When Westinghouse first disclosed privileged materials to the SEC, only one court of appeals had adopted the selective waiver rule. By the time Westinghouse made its disclosures to the DOJ, another court of appeals had trenchantly rejected the selective waiver rule. We find it significant that Westinghouse chose to cooperate despite the absence of an established privileged protecting disclosures to government agencies. We also note that many other corporations also have chosen to cooperate with the SEC despite the lack of an established privilege protecting their disclosures. See Note, 36 Stan.L.Rev. at 822 (noting that over 425 corporations participated in the SEC's Voluntary Disclosure Program[11] in 1979, when only one court of appeals had adopted the selective waiver rule).

[blacked out] Our rejection of the selective waiver rule does not depend, however, on the second reason the D.C. Circuit gave in *Permian* for rejecting *Diversified.* Generally, the "fairness doctrine" is invoked in partial (as opposed to selective) disclosure cases.[12] This case involves selective, rather than partial, disclosure. The courts and commentators disagree about whether there is anything unfair about selective disclosure.[13] Here it is unnecessary to decide the question. We need not find unfairness to the Republic in order to find waiver because we have concluded already that the attorney-client privilege protects only those disclosures necessary to encourage clients to seek informed legal advice and that Westinghouse's disclosures were not made for this purpose.

[blacked out] Westinghouse further contends, however, that the SEC's regulations concerning confidentiality and the stipulated court order memorializing the confidentiality agreement between Westinghouse and the DOJ must be regarded as preserving the attorney-client privilege with respect to the information disclosed because of Westinghouse's expectations of confidentiality engendered thereby. We reject Westing-

---

10. We also note that some commentators have expressed concern that the selective waiver rule, while furthering the public policy of encouraging voluntary cooperation with government investigations, might run afoul of another public policy, namely the policy embodied in the Freedom of Information Act. See, for example, Note, 36 Stan.L.Rev. at 806–13.

11. The SEC developed its Voluntary Disclosure Program in the mid–1970s, when it was investigating the political "slush fund" practices of several corporations. Realizing that it lacked the resources to investigate each case fully, the SEC encouraged corporations to appoint special committees, composed of directors not affiliated with management, to conduct independent investigations of the corporations' practices. These investigations were conducted by outside counsel responsible only to the special committees and their results were shared with the SEC staff. See *In re Sealed Case,* 676 F.2d 793, 800–01 (D.C.Cir.1982).

12. We have explained the distinction between partial and selective disclosures in note 7. When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those commu-

nications actually disclosed, unless a partial waiver would be unfair to the party's adversary. See, for example, *In re Von Bulow,* 828 F.2d 94 (2d Cir.1987). If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject.

13. In *Permian* and its progeny, the D.C. Circuit has taken the view that it is inherently unfair for a party to selectively disclose privileged information in one proceeding but not another. See *Permian,* 665 F.2d at 1221; *In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1370 (D.C.Cir. 1984); *In Re Sealed Case,* 676 F.2d 793, 817–24 (D.C.Cir.1982). We hesitate to rely on this rationale, however, for in our view, when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred. See Developments, 98 Harv.L.Rev. at 1631 n. 14; see also Note, *Limited Waiver of the Attorney–Client Privilege upon Voluntary Disclosure to the SEC,* 50 Fordham L.Rev. 963, 981–82 (1982). But see Comment, 130 U.Pa.L.Rev. at 1226.

house's argument that it did not waive the privilege because it reasonably expected that the SEC and the DOJ would maintain the confidentiality of the information that it disclosed to them.

■ Even though the DOJ apparently agreed not to disclose the information, under traditional waiver doctrine a voluntary disclosure[14] to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else. See, for example, *Rockwell*, 897 F.2d at 1265 ("The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties *or that in fact are so disclosed*.") (emphasis added). See also 8 Wigmore, *Evidence*, § 2327 at 636; Note, 36 Stan.L.Rev. at 792. We also note that the agreement between Westinghouse and the DOJ preserved Westinghouse's right to invoke the attorney-client privilege only as to the DOJ—and does not appear in any way to have purported to preserve Westinghouse's right to invoke the privilege against a different entity in an unrelated civil proceeding such as the instant case.

■ Moreover, even if Westinghouse could preserve the privilege by conditioning its disclosure upon a promise to maintain confidentiality, no such promise was made here regarding the information disclosed to the SEC. As Westinghouse emphasizes, SEC regulations in effect at the time of Westinghouse's disclosures to that agency provided that the SEC would maintain confidentiality as to information and documents obtained in the course of any investigation. See 17 CFR §§ 203.2, 240.0–4 (1978). We do not think, however, that these regulations justified a reasonable belief on Westinghouse's part that the attorney-client privilege would be preserved

with respect to the Kirkland & Ellis letter and the other information disclosed to the SEC. As the Republic observes, the very regulations on which Westinghouse relies explicitly provided that information obtained in the course of a non-public investigation must be made a matter of public record and provided upon request if the disclosure of the confidential information was "not contrary to the public interest." 17 CFR § 240.0–.04 (1978). Moreover, as the Republic further notes, the SEC unsuccessfully sought to have the Securities and Exchange Act of 1934 amended to include a specific provision establishing a selective waiver rule protecting corporate disclosures to the agency. See *SEC Statement in Support of Proposed § 24(d) of the Securities and Exchange Act of 1934*, in 16 Sec.Reg. & L.Rep. at 461 (March 2, 1984). That the SEC itself sought such legislation suggests that the SEC did not interpret its regulations to confer the selective waiver that Westinghouse would have us find in them.[15]

## V. WESTINGHOUSE'S CLAIM FOR PROTECTION UNDER THE WORK–PRODUCT DOCTRINE

Westinghouse also argues that the work-product doctrine shields the documents that it disclosed to the SEC and to the DOJ from the Republic. Once again, Westinghouse's argument requires us to choose between positions taken by the Eighth and D.C. Circuits. In order to evaluate those positions, however, we must begin with a review of the purpose underlying the work-product doctrine.

■ The purpose of the work-product doctrine differs from that of the attorney-client privilege. See, for example, Stephen

14. We consider Westinghouse's disclosure to the DOJ to be voluntary even though it was prompted by a grand jury subpoena. Although Westinghouse originally moved to quash the subpoena, it later withdrew the motion and produced the documents pursuant to the confidentiality agreement. Had Westinghouse continued to object to the subpoena and produced the documents only after being ordered to do so, we would not consider its disclosure of those documents to be voluntary.

15. We do not infer an intention to prohibit the selective waiver rule from Congress's inaction. Rather, we mention the SEC's proposal to show that the agency responsible for construing the regulations on which Westinghouse relies did not interpret them as establishing a selective waiver rule.

A. Saltzburg, *Corporate and Related Attorney–Client Privilege Claims: A Suggested Approach*, 12 Hofstra L.Rev. 279, 303 n. 121 (1984); Willcox, 49 Md.L.Rev. at 922–23. As we have explained, the attorney-client privilege promotes the attorney-client relationship, and, indirectly, the functioning of our legal system, by protecting the confidentiality of communications between clients and their attorneys. In contrast, the work-product doctrine promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation. Protecting attorneys' work product promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients. *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947); *United States v. AT & T*, 642 F.2d 1285, 1299 (DC Cir. 1980).

 A disclosure to a third party waives the attorney-client privilege unless the disclosure is necessary to further the goal of enabling the client to seek informed legal assistance. Because the work-product doctrine serves instead to protect an attorney's work product from falling into the hands of an adversary, a disclosure to a third party does not necessarily waive the protection of the work-product doctrine. Most courts hold that to waive the protection of the work-product doctrine, the disclosure must enable an adversary to gain access to the information. See, for example, *AT & T*, 642 F.2d at 1299. See also 8 Wright & Miller, § 2024 at 210 (citing cases).

 We agree that the purpose of the work-product doctrine requires us to distinguish between disclosures to adversaries and disclosures to non-adversaries. We also find Westinghouse's argument that the DOJ and the SEC were not its adversaries to be without merit. Unlike a party who assists the government in investigating or prosecuting another, see *AT & T*, 642 F.2d at 1300 (party assisting DOJ investigation of another not an adversary to DOJ), Westinghouse was the target of

investigations conducted by the agencies. Under these circumstances, we have no difficulty concluding that the SEC and the DOJ were Westinghouse's adversaries. See also *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (DC Cir.1984) ("*Subpoenas*") ("no question" that target of SEC investigation was SEC's adversary).

 The more difficult question is whether Westinghouse's disclosure to these two adversaries waives the protection of the work-product doctrine as against the Republic. Even though the courts generally agree that disclosure to an adversary waives the work-product doctrine, they disagree over the reasons behind this principle and thus, over its application to specific circumstances.

For example, the Eighth Circuit has found the mere fact of disclosure to one adversary sufficient to waive the work-product doctrine as against other adversaries, even when the first adversary agreed not to disclose the protected documents to anyone else. The court took this position in *In re Chrysler Motors Corp. Overnight Evaluation Program Litigation*, 860 F.2d 844 (8th Cir.1988). That case involved a corporation that had disclosed protected materials to its adversaries voluntarily in a civil suit during settlement negotiations and pursuant to a confidentiality agreement. The United States Attorney subsequently sought access to the materials for use in a related criminal action against the corporation. With little explanation, the Eighth Circuit held that, despite the confidentiality agreement, the corporation had waived the work-product doctrine by voluntarily disclosing the materials to an adversary. 860 F.2d at 846–47.

In contrast, the D.C. Circuit has employed an analysis that considers the fairness of selectively disclosing work product, the discloser's expectations of confidentiality, and the policy underlying the work-product doctrine. The court applied this analysis in *Subpoenas*, which held that a corporation that had voluntarily disclosed materials protected by the work-product doctrine to the SEC, in order to take advantage of the agency's Voluntary Disclosure

Program, had waived the work-product doctrine as against the corporation's shareholders, who sought access to the same materials for use in their subsequent civil suit against the corporation. The court first concluded that it was unfair to selectively disclose work product to one adversary and not to another. See 738 F.2d at 1372. The court then determined that the corporation "did not have any proper expectations of confidentiality which might mitigate the weight against them of such general considerations of fairness." Id. Finally, the court decided that the policy considerations behind the work-product doctrine did not call for recognizing an exception for the SEC's Voluntary Disclosure Program. The court explained:

A healthy adversary system affords protection to an attorney's trial preparation as against actual and potential opponents.... It is said that [voluntary disclosure to government agencies] will be hindered unless the work product privilege covers [it]. *Permian* ... has already rejected, for the attorney-client privilege, an exception for such disclosure, saying, "we cannot see how 'the developing procedure of corporations to employ independent outside counsel to investigate and advise them' would be thwarted by telling a corporation that it cannot disclose the resulting reports to the SEC if it wishes to maintain their confidentiality." The same choice is open under the work product privilege.

Id. 738 F.2d at 1375 (citations omitted).

We hold that Westinghouse's disclosure of work product to the SEC and to the DOJ waived the work-product doctrine as against all other adversaries. As we explained at 1424, parties who have disclosed materials protected by the attorney-client privilege may preserve the privilege when the disclosure was necessary to further the goal underlying the privilege. We require the same showing of relationship to the underlying goal when a party discloses documents protected by the work-product doctrine. In other words, a party who discloses documents protected by the work-product doctrine may continue to assert the doctrine's protection only when the disclosure furthers the doctrine's underlying goal.

Two considerations inform our formulation of this standard for waiving the work-product doctrine. First, we are mindful of the general principle that evidentiary privileges are to be strictly construed. See *University of Pennsylvania*, 110 S.Ct. at 582 (cited in note 8). Second, the work-product doctrine recognizes a *qualified* evidentiary protection, in contrast to the absolute protection afforded by the attorney-client privilege. *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). The protection of the work-product doctrine, unlike that of the attorney-client privilege, may be overcome by a showing of substantial need, and "[l]ike other qualified privileges, [it] may be waived." Id. These two considerations persuade us that the standard for waiving the work-product doctrine should be no more stringent than the standard for waiving the attorney-client privilege.

Applying this standard here, we hold that Westinghouse's disclosures to the SEC and to the DOJ waived the protection of the work-product doctrine because they were not made to further the goal underlying the doctrine. When a party discloses protected materials to a government agency investigating allegations against it, it uses those materials to forestall prosecution (if the charges are unfounded) or to obtain lenient treatment (in the case of well-founded allegations). These objectives, however rational, are foreign to the objectives underlying the work-product doctrine. Moreover, an exception for disclosures to government agencies is not necessary to further the doctrine's purpose; attorneys are still free to prepare their cases without fear of disclosure to an adversary as long as they and their clients refrain from making such disclosures themselves. Creating an exception for disclosures to government agencies may actually hinder the operation of the work-product doctrine. If internal investigations are undertaken with an eye to later disclosing the results to a government agency, the outside counsel conducting the investigation may hes-

itate to pursue unfavorable information or legal theories about the corporation. Thus, allowing a party to preserve the doctrine's protection while disclosing work product to a government agency could actually discourage attorneys from fully preparing their cases.

■ We also reject Westinghouse's argument that it did not waive the work-product protection because it reasonably expected the agencies to keep the documents it disclosed to them confidential. Even if we had found that the agencies had made such an agreement, see discussion at 1427–1430, it would not change our conclusion.

To support its contention that we should be persuaded by its alleged expectations of confidentiality, Westinghouse relies upon two cases decided by the D.C. Circuit, *Subpoenas* and *In re Sealed Case*, 676 F.2d 793 (DC Cir.1982). *Sealed Case* involved a disclosure that was both selective and partial. Consequently, the court analyzed the waiver question in terms of the fairness doctrine typically applied to cases involving partial disclosures. Although *Subpoenas* involved only a selective disclosure, the court also relied upon the fairness analysis employed in *Sealed Case* when it implied that had the disclosing party reasonably expected confidentiality, its expectations would have mitigated against the "unfairness" of selective disclosure.

We have distinguished between partial and selective disclosures of materials protected by the attorney-client privilege, see note 7, and we have observed that the type of disclosure at issue in this case is selective disclosure. We also have explained that the fairness doctrine applies in cases in which there has been a partial (as opposed to selective) disclosure of communications protected by the attorney-client privilege. See 1426–1427. Our analysis limiting the application of the fairness doctrine to *partial* disclosure applies equally in the context of the work-product doctrine. We decline to extend the fairness doctrine

to cases involving selective disclosures because, as we explained at note 13 we do not see how disclosing protected materials to one adversary disadvantages another. Therefore, *Subpoenas* and *Sealed Case* do not aid Westinghouse's cause.

In *In re John Doe*, 662 F.2d 1073 (4th Cir.1981), the Fourth Circuit also found the lack of a confidentiality agreement significant in determining whether a party had waived the work-product doctrine. *Doe*, however, is easily distinguished from the instant case. *Doe* arose when a criminal defendant informed the United States Attorney that Doe, his former lawyer, had advised him to give false testimony and to bribe witnesses. The United States Attorney instigated a grand jury investigation of Doe and presented to the grand jury documents that Doe had prepared while representing his former client and then inadvertently turned over to the client. Doe moved that the documents be returned to him and that the grand jury be dismissed as tainted by its improper consideration of material protected by the work-product doctrine.[16]

The Fourth Circuit focused on "a concern inherent in the work product rule: that since an attorney's work is for his client's advantage, opposing counsel or adverse parties should not gain the use of that work through discovery." 662 F.2d at 1081. It reasoned that in order to waive the protection of the doctrine by disclosing material to a third party, the disclosure must indicate "conscious disregard" of the possibility that an adversary would gain access to the material. Id. The court then announced the following standard:

> [T]o effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material.

Id.

Applying that standard, the court determined that Doe had waived the protection of the work-product doctrine. At the time

---

**16.** Doe also moved to quash the grand jury's subpoena seeking additional documents related to those already disclosed. We do not discuss this aspect of *Doe* because it concerns the effect of a partial disclosure and the instant case involves only a selective disclosure.

Doe released the documents, his relationship with his former client was strained. Moreover, Doe failed to take steps to limit the client's future use of the documents. Therefore, the court concluded that Doe's disclosure "substantially and freely increased the possibility of disclosure" to anyone and thus waived the work-product protection. Id. at 1082.

 Unlike the instant case, *Doe* involved an inadvertent disclosure to a party who, while no longer sharing common interests with Doe, was not clearly an adversary. Under those circumstances, the court found it significant that Doe had taken no steps to protect the confidentiality of the documents he disclosed to his former client. Fear of waiving the doctrine's protection by an inadvertent disclosure, or by a disclosure to a non-adversary, might well chill attorneys from fully preparing their cases. Therefore, when the disclosure is either inadvertent or made to a non-adversary, it is appropriate to ask whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials. Thus, had the DOJ and the SEC not been Westinghouse's adversaries, and had we concluded that Westinghouse reasonably expected the agencies to keep the material that it disclosed to them confidential, we might reach a different result. But because Westinghouse deliberately disclosed work product to two government agencies investigating allegations against it, the Fourth Circuit's analysis in *Doe* does not apply here.[17]

## VI. CONCLUSION

For the foregoing reasons, we conclude that Westinghouse waived the attorney-client privilege and the work-product doctrine when it disclosed otherwise protected documents to the SEC and to the DOJ. Therefore, the district court did not commit clear error in ordering Westinghouse to produce the disputed material. Accordingly, the petition for a writ of mandamus will be denied.

**17.** The district court did not distinguish between opinion and non-opinion work product when it decided that Westinghouse had waived the protection of the work-product doctrine. The Fourth Circuit has made this distinction in *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir. 1988), cert. denied 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989), a case involving a waiver effected by a disclosure that was both partial and selective. The distinction between opinion and non-opinion work product was developed by the Supreme Court in *Hickman* to explain that a showing of necessity is sufficient to overcome the protection of the work-product doctrine when the documents sought do not contain opinion work product, i.e., writings which reflect an attorney's mental impressions, conclusions, opinions or legal theories. 329 U.S. at 508, 67 S.Ct. at 392. We acknowledge that the work product at issue here undoubtedly is of both varieties. The parties have not argued, however, that the distinction is significant in answering the entirely different question of whether the protection of the doctrine has been waived, nor does it appear to us to be significant on this record. See Willcox, 49 Md.L.Rev. at 933–34.