The **NAVAJO NATION**, Plaintiff,

v.

The **UNITED STATES of America**, Defendant.

No. 93–763L.

United States Court of Federal Claims.

March 31, 2000.

Jacob A. Stein, Washington, D.C. for plaintiff and plaintiff's counsel, Paul E. Frye.

R. Anthony Rogers, Washington, D.C., with whom were Assistant Attorney General Lois J. Schiffer and Kristine S. Tardiff, for defendant. Mary Jane Sheppard, Washington, D.C., of counsel.

Jeffrey B. Smith, Washington, D.C., with whom were Peter Buscemi and Brad Fagg, for third party, Peabody Holding Company, et al.

## OPINION

BASKIR, Judge.

This matter involves the enforcement of a protective order issued by this Court. The moving parties, Peabody Holding Company, Inc., Peabody Coal Company, and Peabody Western Coal company (collectively "Peabody") request that we hold in contempt plaintiff and plaintiff's counsel, Mr. Paul E. Frye, Esq., and impose sanctions. Peabody alleges that plaintiff violated the Court's Confidentiality and Protective Order dated February 26, 1996, (CAPO) by using informa-

tion and documents subject to that Order, and specifically the "Sullivan memorandum," to pursue a lawsuit against Peabody in the United States District Court for the District of Columbia.

In deciding whether to hold plaintiff in contempt we evaluate whether the plaintiff has violated the Order, and if so, to what extent. After reviewing the CAPO in the peculiar context of the discovery in this case, we find that the Navajo Nation has substantially complied with the CAPO. Accordingly, we deny Peabody's motion.

The Navajo Nation has filed a motion to determine the status of documents presumably covered by the CAPO, asking that we remove that protection. Although we consider the Sullivan memorandum to be in the public domain, we decline to do so, and therefore deny plaintiff's motion. We also deny plaintiff's motion to compel production of certain Peabody documents.

## BACKGROUND

Peabody is not a party in the above-captioned case, a claim by the Navajo Nation against the United States alleging breach of trust and breach of contract. However, Peabody is intimately involved in the facts surrounding the Navajo Nation's claims. Those facts are laid out in detail in our Opinion dismissing this suit. *See Navajo Nation v. United States,* 46 Fed.Cl. 217 (2000). We repeat them only as necessary to resolve the disputes presently before us. At the outset, we note that defendant takes no position on the present motions.

### The Underlying Claims

The Navajo Nation's claims center around the approval in 1987 by then-Secretary of the Interior Donald Hodel of amendments to a coal lease between the Navajo Nation and Peabody. Chief among the amendments was the increase in the royalties to be paid for Navajo coal. The lease entered into in 1964 provided for the payment of 37.5 cents per ton, an inequitable rate by modern day standards. In 1987, that rate was amended to 12.5 percent, a rate negotiated by the Navajo Nation and Peabody.

The royalty rate had been a contentious topic for some time prior to the negotiated amendments. As the 20–year anniversary of the lease approached, the parties anticipated an increase of the royalties pursuant to a lease clause authorizing the Secretary to make a reasonable adjustment. In June 1984, the Navajo Area Director, an official of the Bureau of Indian Affairs, significantly increased the royalties to 20 percent. Peabody and other private interests affected by the potential rise in coal royalties immediately appealed the decision. Then, upon learning that the appeal was likely to be denied, the companies lobbied to stay consideration of the appeal and force further negotiations with the Indians. Peabody hired Stanley Hulett, a close personal friend of Mr. Hodel, to intervene on its behalf. Unbeknownst to the Navajo Nation, the Secretary met with Mr. Hulett and subsequently signed a memorandum, drafted by Peabody, directing Interior Department officials to urge the parties to negotiate further. The directive was contrary to the expressed desire of the Navajo, who wished to resolve the pending appeal without further delay or negotiation. The Sullivan memorandum relates Mr. Hulett's role in these events.

### Discovery Disputes With Peabody

Evidence of Peabody's activities was directly relevant to plaintiff's claims against the United States. But non-party discovery did not progress smoothly. Evidence regarding the Hulett–Hodel meeting came to light at an excruciatingly slow pace. We relate this discovery history in some detail both to give a flavor of that process and also to contrast it with recent litigation in this case. In summary, it suffices to say that Peabody immediately identified the Sullivan memorandum as subject to the first subpoena it received from the government. Agreements of counsel and Court orders notwithstanding, Peabody did not reveal the existence of the memorandum until forced to do so after its existence was independently discovered by the parties' counsel. It was not actually produced until January 31, 1997, a full 2½ years after the initial subpoena.

The case was filed in December 1993. As early as July 1994, the United States served two very broad subpoenas on Peabody seeking production of documents relating to the amendment of the Navajo–Peabody lease. Peabody attorneys promptly prepared a list of potentially responsive material. *See* Summary of Documents Potentially Relevant to Department of Justice Subpoena (Plaintiff's Opposition, Ex. 6). However, there were items on this list that Peabody felt were protected from discovery. Notable among those items is the following entry marked with an asterisk and a question mark:

> Internal memorandum—CONFIDEN-TIAL—from E. Sullivan to F. Barkofske re: Navajo Lease Royalty Rate Adjustment.

Pl. Opp., Ex. 6 at 3. The document denoted by the entry, the Sullivan memorandum, relates the circumstances of Mr. Hulett's hiring, summarizes the Hulett–Hodel meeting, discusses the legal considerations of engaging in *ex parte* contact, and comments on the payment for Mr. Hulett's services. The summary of potentially responsive documents was used internally by Peabody, and was apparently not disclosed to the Navajo Nation nor the United States, at least not until after they discovered the Sullivan memorandum.

Production of the subpoenaed documents was stalled while the parties attempted to come to an agreement on confidentiality. On June 14, 1995, the Navajo Nation served two subpoenas of its own upon Peabody. Peabody resisted production of the items responsive to the Navajo Nation's subpoenas.

The government cooperated fully with plaintiff in an effort to facilitate non-party discovery and the parties repeatedly called upon the Court to intervene in discovery disputes involving Peabody. It was not always clear whether Peabody objected to production of documents on the basis of privilege (whether attorney/client or attorney work product) or because it considered the material proprietary in nature. Certainly the latter was a major concern. In resisting the Navajo Nation's motion to compel production, Peabody argued that disclosure of the documents would compromise ongoing and future negotiations of other leases.

Discovery deadlines were continued time and again while the Navajo Nation and Peabody negotiated the terms for production of documents. Apparently, the level of particularity by which purportedly privileged materials would be described in a privilege log was a formidable stumbling block. In the end, Peabody agreed to furnish the facts recounted in those documents for which it claimed privilege.

Despite the early identification of relevant documents in Peabody's possession, Peabody and the Navajo Nation did not concur upon the terms of a protective order until February 26, 1996. But even with the February 1996 CAPO in place, Peabody resisted producing documentation regarding its efforts to amend the lease and, more particularly, its attempts to avoid imposition of the Area Director's decision. Peabody still did not produce or even reveal the existence of the Sullivan memorandum.

On July 5, 1996, plaintiff renewed its motion to compel, and the Court heard oral argument on the motion on November 6, 1996. At oral argument the parties agreed that Peabody would release all non-privileged documents presently in dispute. *See* Order, dated November 7, 1996. The Court warned that Peabody would be permitted to assert privilege only by fully describing the withheld documents and explaining how they fit within the privilege claimed. Further, the Navajo Nation and Peabody were to meet and resolve all discovery disputes before December 2, 1996.

Peabody did not immediately comply. The Sullivan memorandum, for example, was still not specifically identified as a document that Peabody intended to withhold under claim of privilege. The existence of the memorandum remained secret until plaintiff's counsel and government counsel discovered a reference to it while reviewing a privilege log prepared by Peabody for a 1988 Senate investigation. This prompted specific inquiries to Peabody by plaintiff and the government. Peabody attorneys finally admitted the existence of the document and asserted privilege formally

by describing the memorandum in the following manner:

> July 22, 1995, memorandum from attorney E.L. Sullivan of Peabody to attorney F.L. Barkofsky of Peabody regarding Navajo lease royalty rate adjustment and discussion of thoughts, impressions, strategy, and analysis of a meeting with Mr. Hulett, Greg Leisse, and Mr. Sullivan regarding Mr. Hulett's participation on behalf of Peabody and the impressions, strategy, and analysis of Mr. Sullivan regarding Mr. Hulett's efforts, with attached July 15, 1985 draft memorandum from Don Hodell [sic] to John Fritz re: Appeal of Navajo Area Director's Adjustment of Royalty, Lease No. 14–20–0603–8580. These have been withheld as attorney/client privileged documents and work product privileged documents.

*See,* Joint Status Report dated December 13, 1996, with attached Exhibit A (stipulation signed by Peabody, Navajo Nation and the United States, dated November 19, 1996) and Exhibit B (letter from Smith to Rogers and Frye, dated November 22, 1996, document 15) at 4.

The United States and the Navajo Nation then filed a joint motion to compel the memorandum's production. Despite its earlier claims of privilege and prior to a ruling on this most recent motion to compel, the disputed document was provided to the Navajo Nation and the government in January 1997. Peabody produced the Sullivan memorandum in unredacted form, apparently either as a waiver or an abandonment of its claim of privilege.

However, Peabody stated that it submitted the Sullivan memorandum under the terms of the CAPO, the November 7, 1996 Order, and the stipulation of the parties, and stamped it "confidential." Thus, the status of the Sullivan memorandum was anomalous. Once it received a specific demand for its production, Peabody expressly claimed that the document was protected by the attorney/client or attorney work product privileges and not subject to production at all. By producing it unredacted, this claim no longer existed. However, by stamping it as confidential and citing all the other available

sources of document protection, Peabody obviously hoped that one or another would limit its circulation.

Apparently operating under the assumption that the CAPO applied "to privileged materials," the Navajo Nation then urged the Court to exclude the Sullivan memorandum and other related documents from its protection. *See* Motion For Determination of Status of Peabody Documents Under CAPO and for Sanctions (July 18, 1997). In support of its motion, the Navajo Nation made the same arguments it now makes in its defense to Peabody's contempt motion. Interestingly, the Navajo Nation did not argue then or now that the CAPO applied only to proprietary materials, that attorney-related privileged documents never had to be produced, and that consequently producing the unredacted memorandum despite its earlier claimed privileged status freed it from any kind of protection. Instead, the Navajo Nation insisted that the Sullivan memorandum was either never protected to begin with or that any protection was waived. In response, Peabody requested sanctions, arguing that plaintiff's motion was frivolous in light of the fact that the Navajo Nation had all the documents necessary to pursue the present lawsuit.

In a status conference held September 29, 1997, the Court agreed that many of the issues appeared moot, but declined to impose sanctions on either party. Instead, the Court again directed the parties to resolve their discovery disputes. In October 1997, the parties submitted a Joint Status Report withdrawing the motions without prejudice. Clearly, the dispute over the CAPO and the Sullivan memorandum remained unresolved. But the Court was not asked to revisit the issue until now.

With non-party discovery finally in hand, litigation of the substantive claims commenced. The Navajo Nation and the United States both extensively cited the Peabody documents in briefing cross-motions for summary judgment beginning in December 1997. At no time did the Navajo Nation assert that the record was inadequate for these purposes, or that release of additional Peabody documents was required before the motions

could be decided. The Sullivan memorandum was reproduced in its entirety, used as an unsealed exhibit by the Navajo Nation, and referred to in the dispositive motion papers. *See* Appendix to Brief in Support of Plaintiff's Motion for Summary Judgment on the Issue of Liability on its First Claim for Relief, vol. I at 595–98 (December 15, 1997). The pleadings have remained available in the Clerk's Office for public inspection, and the Courtroom doors were open for anyone who desired to hear the two oral arguments held on the summary judgment motions in July and then October 1999. During the course of this litigation, neither the United States nor the Navajo Nation served its briefs on Peabody. We have not been advised of any requirement that either party do so.

*The Alleged Violation*

The Navajo Nation filed a second lawsuit on February 6, 1999, this time in District Court. Peabody was named as one of several defendants. The complaint was filed *ex parte* and under seal. Consequently, neither Peabody, nor the government, nor this Court, was aware of the new litigation at the time, much less the contents of the complaint. We are not much more enlightened today. Certainly no party has filed the sealed complaint as part of the record in our case and neither Peabody nor the United States has professed knowledge of its contents.

On June 9, 1999, plaintiff filed an amended, public version of the District Court complaint. It was not filed under seal—the Navajo Nation claimed that the second version relied only on documents and information not subject to the CAPO. It was only with this amended complaint that Peabody became aware that it had to defend against an action in District Court and that there exists a prior sealed version perhaps utilizing CAPO documents. Peabody's contempt motion is directed at the initial sealed Navajo Nation complaint of February 1999. The June 6, 1999, filing is not challenged. That public complaint is also not part of our record.

Peabody, in moving for sanctions, necessarily assumed that the sealed complaint made use of material subject to the CAPO, and specifically the Sullivan memorandum.

Indeed, Peabody's motion was briefed with all parties making this assumption. However, only at oral argument did Mr. Jacob Stein, who represents the Navajo Nation and Mr. Frye in these contempt proceedings, concede that the sealed complaint relied upon Peabody's materials that disclosed the *ex parte* contacts with Secretary Hodel. Whether those documents were appended to, cited by, or merely used in the District Court sealed complaint is another matter. We cannot say. The extent and nature of the reliance could under other circumstances be significant factors in determining whether there had been a serious violation, or in fashioning sanctions. But for the purposes of the contempt motion, we know no more than that the Sullivan memorandum was used in a sealed *ex parte* complaint against its author. Absent Mr. Stein's concession, Peabody's motion was vulnerable to dismissal for failure to prove this essential fact.

When it filed the complaint in District Court, the Navajo Nation erroneously represented that a motion for determination of the status of CAPO documents was presently pending before this Court. We promptly corrected this misunderstanding, and the Navajo Nation rectified its error by formally renewing on November 5, 1999, the July 18, 1997, motion to determine the status of the Sullivan memorandum.

Peabody obviously is not concerned with public disclosure of the documents. Peabody has not satisfactorily addressed the fact that the Sullivan memorandum itself and information it contains were freely used in the briefing and argument on the merits of the litigation, and remain public to this day. Peabody might have been expected to monitor the case to protect its confidentiality interests. But even failing this, Peabody did not move to seal these papers once it became aware they were in the public record. We had occasion to make this observation in our published Opinion of February 7, 2000. We then concluded that Peabody had slept on its CAPO rights as respects any disclosure in that Opinion. In the time since that Opinion, Peabody still has not moved to protect its interests. It is clear that it considers the

document's confidentiality long since lost as a practical matter.

## DISCUSSION

### Contempt Legal Standard

■ Civil contempt is recognized as a severe remedy—the moving party in a contempt proceeding carries a heavy burden of proving violation of the Court's order by clear and convincing evidence. *Preemption Devices, Inc. v. Minnesota Mining & Manuf. Co.,* 803 F.2d 1170, 1173 (Fed.Cir.1986)(citing *KSM Fastening Systems, Inc. v. H.A. Jones Co.,* 776 F.2d 1522, 1524 (Fed.Cir.1985)). Accordingly, the Court does not hold a party in contempt when there is "a fair ground of doubt as to the wrongfulness of the [party's] actions". *Id.*(citing *MAC Corp. of America v. Williams Patent Crusher and Pulverizer Co.,* 767 F.2d 882, 885 (Fed.Cir.1985)); *see also, Morris v. United States,* 37 Fed.Cl. 207, 214 (1997). To warrant a finding of contempt, the moving party must demonstrate by clear and convincing evidence that: (1) the offending party violated an order of the Court; (2) the violation was more than *de minimis* or technical noncompliance; and (3) the conduct was not the product of a good faith or reasonable interpretation of the order. 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51[7][b] (3d ed.1999).

### Plaintiff's Defenses

Plaintiff offers a multiple-layered defense to Peabody's motion. Plaintiff argues, for example, that the challenged documents are not protected because Peabody failed to submit the documents in accordance with the CAPO's procedures, specifically in regard to claiming privilege, or violated other procedural requirements of the Court's Rules, or discovery orders. We need not address this point at length, but we wish to note that we do not base our holding on this ground.

The Navajo Nation claims that even if it violated the CAPO, sanctions are not appropriate because the CAPO was not supported by a showing of good cause for protecting the documents. Specifically, plaintiff argues that the documents are not privileged and the public's right to access outweighs any inter-est of Peabody in maintaining the confidentiality of those documents.

This argument is a direct assault on the legitimacy of the Court's Order. Plaintiff ignores what has gone before. The parties negotiated the terms of the CAPO and the Court gave it force and effect. After a lengthy process the Navajo finally received the materials needed to prosecute this case while Peabody claimed the protection of the CAPO. Although they could have turned more quickly, the wheels of justice most certainly turned—the CAPO ultimately facilitated discovery and the case proceeded to decision. The parties were free at any point to have the Court reconsider and modify the Order. It is now too late.

The plaintiffs also attack the claim of privilege substantively, arguing that the documents are not in fact attorney work product or attorney/client documents. They also argue the application of the crime/fraud exception. Alternatively, the Navajo Nation argues that Peabody waived protection by its passivity in the face of disclosure of matters it previously deemed privileged. While waiver may not obviate plaintiff's violation, if any, of the CAPO, we do find Peabody's inconsistent stance curious. Peabody has acquiesced in the public disclosure of information it so zealously guarded prior to the revelation of the Hulett–Hodel meeting. Before the Court's most severe sanctions are invoked, we expect the injured party to justify the remedy it seeks in light of the insubstantial harm it has suffered and its own inaction in the face of greater harm.

Finally, the Navajo Nation maintains that it has substantially complied with the CAPO and, therefore, should not be held in contempt. We are persuaded by this argument. Under the circumstances, Peabody has failed to carry its burden of establishing that the Navajo Nation's sealed complaint in District Court is any more than a *de minimis* violation of the CAPO, if even that.

### Substantial Compliance

■ Peabody's contempt motion relies principally on the following language of the 13–page CAPO:

Except as provided herein, neither the Navajo Nation nor the United States shall use any documents or information from Peabody, Salt River Project and Southern California Edison designated as confidential *for any purpose other than for the purposes of prosecuting or defending the action* (defined earlier in the CAPO as the action initiated by the Navajo Nation "in the United States Court of Federal Claims against the United States, Docket No. 93–763L").

CAPO, ¶ 5 (emphasis added).

Read literally, this provision bars all use outside of the Court of Federal Claims of any evidence covered by the CAPO. But we do not read the Order so broadly, especially in the context of a contempt proceeding. Instead, we adopt the approach of the Ninth Circuit in assessing alleged protective order violations, and interpret the CAPO in a common sense and reasonable manner that "connect[s] its prohibitions to its purpose." *In re Dual–Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir. 1993).

Although Peabody argues otherwise, the *Dual–Deck* case is highly persuasive. In that case Go–Video, Inc., a party pursuing alleged antitrust violations, agreed to a broadly worded protective order not unlike the one signed by the Navajo Nation. During discovery Go–Video found evidence that demonstrated additional antitrust violations. But when the Court issuing the protective order denied a motion to amend the complaint, Go–Video was forced to file a second lawsuit. In doing so, it necessarily relied upon and referred to discovery information from the initial lawsuit to advance the subsequent one.

The Court characterized such actions as "technical violations" of the protective order. *Dual–Deck,* 10 F.3d at 695. However, the Court emphasized that these violations did not amount to contempt. The use restriction was designed to protect against disclosure of commercial secrets, and Go–Video filed the collateral action under seal. *Id.* Under those circumstances, the Court held that the moving party failed to carry its burden of proving by clear and convincing evidence that

there was no "substantial compliance" with the order. *Id.* at 696; *but see, On Command Video Corporation v. LodgeNet Entertainment Corporation,* 976 F.Supp. 917, 922 (N.D.Cal.1997)(although it applied *Dual–Deck* approach, Court found mere "use" of protected information violated order regardless of attempts to seal court record).

The Navajo Nation found itself in a similar predicament. It was required to pursue a separate action, not as the result of a ruling as in *Dual–Deck,* but because the jurisdiction of this Court does not extend to claims against private parties. Perhaps the Navajo Nation might better have raised its dilemma before us prior to taking any action. However, that would put this Court in the awkward position of determining what information might properly be used to initiate an action in a sister federal court, a role we would be most reluctant to assume. Plaintiff was not heedless of the CAPO. Instead, it informed the District Court of the existing protective order and filed the matters under seal and *ex parte,* precluding disclosure and maintaining the *status quo* until the matter could be decided by the appropriate court. We find that this course complies with the spirit if not the technical letter of the CAPO.

The CAPO is a product of the negotiation of several parties. As such, it is no model of clarity. "No use" is certainly much broader than "no disclosure." But to understand the CAPO's restrictions in context, we must look to the type of information for which its protection is designed. Clearly, it is proprietary information.

The preamble of the CAPO is a logical place to start in making the connection between prohibition and purpose. The "WHEREAS" clauses reflect that the parties intended to enable the Navajo to secure relevant evidence while treating *proprietary* information in a *confidential* manner. The procedural history confirms this purpose—Peabody resisted discovery on several occasions, arguing that certain information could compromise its bargaining position in other negotiations. Apparently, Peabody was primarily concerned with disclosure of the materials to the public, competitors or even the Navajo Nation client for purposes unrelated

to the underlying litigation. Protection afforded this type of information is far different than that afforded privileged information, where it is not simply disclosure to the public that is to be avoided, but disclosure to the demanding party. Privileged information is, in a word, secret information.

Overall, the text of the CAPO does not contemplate the coverage of *privileged* material. The CAPO's non-waiver clauses and provisions for claiming privilege confirm that protection of privileged materials arises independent of the CAPO. *See*, CAPO at ¶ 17. The CAPO demanded that the *facts* within privileged documents be disclosed, but recognized the parties' ability to prevent disclosure of privileged work product or client communications by furnishing enough information to allow the Court to determine the propriety of the claim of privilege. CAPO at ¶¶ 17–20.

There is never a doubt that privilege claims are independent of the CAPO. For example, amidst the 1997 discovery stalemate, the Court clearly ruled:

> Peabody shall release to plaintiff all documents presently in dispute. Peabody may stamp the documents "confidential" prior to their production. If necessary, Peabody may assert claims of privilege with regard to certain documents. Peabody shall describe these documents and provide an explanation of how the documents fit within the privilege claimed. Production of documents for purposes of the present case shall not constitute a waiver of any right of Peabody to raise a claim of privilege as to these documents in any other present or future litigation.

Order (Futey, J., Nov. 7, 1996).

Clearly, claims in other fora are implicated by this order. The District Court, for instance, is perfectly capable of ruling on claims of privilege, without regard to the application of the CAPO. *See* Stipulation, ¶ 5 (November 19, 1996)("The parties agree that the production of any of the documents presently in dispute shall not constitute a waiver of any privilege of Peabody or any of its affiliates, subsidiaries, or related companies that may be asserted in any other present or future litigation.") Peabody understood its

rights respecting privileged documents, and initially guarded these rights zealously, especially as respects the Sullivan memorandum. When it released that memorandum, in its entirety, Peabody made an informed decision that either the contents were not privileged or that any privilege was no longer worth pursuing. We believe Peabody's claim of confidentiality under the November 1996 Order, the Stipulation, and the CAPO was only a last grasp at whatever residual protection might be arguable.

We cannot reconcile Peabody's current interpretation of the CAPO with the legitimate goals furthered by the agreement. Although the Navajo Nation chose to sue the government first, we assume that Peabody was always a potential target, especially after the facts surfaced the way they did. Certainly, from the start Peabody must have contemplated its legal vulnerability, a vulnerability implicit in the Sullivan memorandum itself. In pursuing its second target, the Navajo would necessarily rely upon the information yielded by the discovery in this case. As the Ninth Circuit observed, it is absurd to expect parties participating in discovery to "achieve total amnesia" regarding information gained in a collateral action's discovery. *See Dual–Deck*, 10 F.3d at 695.

The protective order was not intended to shield from liability the party furnishing information under it, especially not as regards claims arising from the same series of events pursued by the same party. *See., id.* at 696. Under such an interpretation, the more information Peabody furnished, the more it would constrain the Navajo in pursuing relief—Peabody could liberally disclose information as a means to avoid its own civil liability. No order of this Court will aid in such an endeavor.

Peabody points out that in justifying the need for the two complaints in District Court, Mr. Frye admitted that the CAPO "broadly prohibits" use of documents as to which a party has claimed confidentiality. Peabody views this as a concession by the Navajo Nation that its initial complaint contained information that is at least purportedly protected by the CAPO. So it may. But

the statement also demonstrates plaintiff's attempt to comply substantially with the Order and to pursue its claims without frustrating the goals of the Order. In short, it shows an effort at good faith compliance. We recognize that good faith alone does not excuse the violation of an order. *Dual–Deck,* 10 F.3d at 695. Nevertheless, we should encourage rather than punish such efforts, especially in dealing with the treatment of potentially confidential matters.

In closing this discussion, it is important to consider precisely to what extent the use of the Sullivan memorandum in the sealed complaint jeopardized the document's confidentiality. Or, to put it another way: Was any violation technical or *de minimis?* In actual fact, the circumstances of plaintiff's use and disclosure of that document was all but a non-event. A sealed, *ex parte* complaint is about as close to a vain thing as there can be in the law. It does not initiate litigation in any real sense since the defendant itself remains unaware of the complaint. The complaint simply sits there in the Court's sealed records. And the only persons to whom its contents are "disclosed" are another federal judge (perhaps) and a few court employees, if that.

Something more must happen to give content to this "use." As it turns out, that something more was the filing of a public, amended complaint which displaced its predecessor. This had the effect of "correcting" any temporary transgression and reducing to the vanishing point the significance of the sealed, *ex parte* complaint. If pressed, we would be hard put to find even a technical violation of the CAPO's literal "use" prohibition.

### Justification for Requested Sanctions

We do not reach the question of sanctions since we decline to find the Navajo Nation or Mr. Frye in contempt. Yet it is worth noting that Peabody has utterly failed to establish that any violation of the CAPO caused it harm. Aside from the fact that the District Court complaint was filed under seal, the Sullivan memorandum was already in the public domain. Much of the material has been filed in other forms during the briefing of the summary judgment motions. Although some filings of the documents remain under seal, the matters reported in the documents have been extensively referred to during the course of this litigation without objection by Peabody, hitherto not shy about protecting its interests.

The operative facts recounted in the incriminating memorandum were discussed in unsealed depositions, such as that of Mr. Hulett, which was praised by plaintiff's counsel as a "model of clarity and candor." Hulett Depo. (June 24, 1997); Appendix to Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment, vol. II at 1248. That deposition, as well as others before and after it, contain the same information for which Peabody later claimed confidentiality. Although portions of certain depositions were filed under seal, excerpts of those depositions have also been filed publicly in the briefing of motions of summary judgment.

Viewed in the context of what has happened before and since, Peabody's contempt motion loses still more weight. While Peabody has sought sanctions for the use of the Sullivan memorandum in the sealed *ex parte* complaint, it has left unchallenged and unremedied the public and published use of that same memorandum and the information it contains. Even were we to disregard any expectation that Peabody would be vigilant to protect its confidential information in the latter stages of this litigation, we cannot disregard its subsequent inaction. When aware of this public use, Peabody has done nothing, not even after its omission was pointed out at oral argument on its motion in October 1999. And it has not acted since.

Indeed, the memorandum has not only remained in the public record of this Court for 27 months, but its substance has since appeared in two nationally circulated newspapers and in an Associated Press wire service story. Truly has Peabody swallowed a camel and strained at a gnat. It will have to swallow the gnat, as well.

### Status of Documents

The Navajo Nation has renewed its July 1997 motion that we determine the status of the Sullivan memorandum and related documents. We have no wish to revisit the con-

tentious discovery disputes of 1996 and 1997. However, we recognize plaintiff's predicament. The Navajo Nation fought long and hard to uncover facts which establish what we have condemned as a betrayal of public trust, only to find it without a remedy in our Court. The Navajo Nation, therefore, seeks its relief in another forum. We do not plan to dictate discovery in a sister court, even indirectly.

As we have noted, Peabody cannot argue convincingly that matters it considered confidential and privileged during discovery in 1997 remain so today, after all that has occurred in this litigation. We think Peabody has conceded the public status of the Sullivan memorandum. The District Court may agree.

We note that with the exception of the Sullivan memorandum, the Navajo Nation has never been precise in describing the documents that it wishes to exclude from the CAPO. Formerly, the Navajo Nation requested the Court to find that documents *"including but not limited to* [the Sullivan memorandum] and an attachment thereto [the draft memorandum for Secretary Hodel's signature]" no longer subject to the protection of the CAPO. Motion for Determination of Status (July 18, 1997). Most recently, the Navajo Nation moved for "an order holding that *various documents* concealed and withheld" by Peabody are not entitled protection under the CAPO. Motion for Determination of Status of Documents under CAPO (November 5, 1999)(emphasis added). Throughout its briefs, plaintiff re-

fers to the Sullivan memorandum and "related documents." Since we do not know what the Navajo Nation means by "related documents," we deny its motion for that reason if none other.

Finally, the Navajo Nation asks that we order Peabody to produce "belatedly identified documents listed in Peabody's letter dated November 22, 1996". Motion for Determination of Status of Documents under CAPO, 48 (November 5, 1999). Apparently many of these documents have never been produced, even under the CAPO, for reasons ranging from privilege to the protection of commercial secrets. The Navajo Nation has chosen to pursue its case without the documents and has not been hindered by their absence. We decline to order production of those documents now that the litigation before us is complete.

## CONCLUSION

Accordingly, Peabody's motion to hold plaintiff in contempt and its request for sanctions are DENIED. The Navajo Nation's motions for determination of the status of documents and for further production are also DENIED.

IT IS SO ORDERED.