**THE NAVAJO NATION,**
**et al., Plaintiffs,**

v.

**PEABODY HOLDING COMPANY,**
**INC., et al., Defendants.**

**No. CIV.A. 99–469(EGS).**

United States District Court,
District of Columbia.

June 24, 2002.

Samuel J. Buffone, Kelly B. Kramer, William M. Carter, Jr., Ropes & Gray, Washington, DC, Britt E. Clapham, II, Levon Henry, John Rutherford, Navajo Nation Dept. of Justice, Window Rock, AZ, Paul E. Frye, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Frye, Albuquerque, NM, for Navajo Nation.

Peter Buscemi, Brad Fagg, Morgan, Lewis & Bockius, Washington, D.C. Vernon Thomas Lankford, Jr., Lankford & Coffield, PLLC, Alexandria, VA. Terry Reed, Reed Law Firm, Alexandria, VA, for Peabody Holding Co., Inc., Peabody Coal Co., Peabody Western Coal Co., Gregory J. Leisse, Edward L. Sullivan.

Richard Harper Saltsman, William R. Sherman, Washington Lawyers' Committee, Washington, DC, James Francis Hibey, Howrey Simon Arnold & White, LLP, Washington, DC, for Salt River Project Agric. Improvement & Power Dist.

Antonia B. Ianniello, Reid Henry Weingarten, Paul Robert Hurst, Steptoe & Johnson, Washington, D.C., Shannen Wayne Coffin, Alexandria, VA, for Southern California Edison Co.

Irvin Bertram Nathan, Joel M. Gross, Arnold & Porter, Washington DC, James E. Scarboro, Michael A. Saul, Arnold & Porter, Denver, CO, Timothy R. Macdonald, Arnold and Porter, Denver, CO, for the Hopi Tribe.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

The parties to this action have been actively involved in its litigation for the past two and a half years. The case is in a unique procedural posture, as many of the claims asserted by Navajo Nation and the Hopi Tribe against the defendants are at issue in a lawsuit filed by the Navajo Nation in the Federal Circuit against the United States. The Supreme Court recently granted the United States' petition for writ of certiorari in the Federal Circuit case.

Three matters are presented to the Court for resolution. First, defendant Salt River Project ("SRP") asks the Court to enter final judgment in its favor. The Navajo Nation and the Hopi Tribe conversely seek to reinstate claims against SRP. Second, defendants Peabody Holding Co., Peabody Coal Co. and Peabody Western Coal ("Peabody defendants") move the Court to transfer this case to the District Court for the District of Arizona or, in the alternative, to stay this matter until litigation in that district has been resolved. Finally, the Peabody defendants and defendant Southern California Edison ("SCE") have filed motions for entry of a protective order that would stipulate that neither Peabody nor SCE waived privi-

leges with respect to documents that were disclosed in the Court of Federal Claims case pursuant to a confidentiality agreement.

## 1. Procedural History

In December 1993, the Navajo Nation sued the federal government in the Court of Federal Claims for actions relating to coal leases on tribal land. Navajo Nation alleged that the government had breached its statutory and fiduciary duties by first delaying a decision on the disputed royalty rate, and then approving an inadequate rate. Specifically, the area director had recommended a 20% royalty rate, but Secretary of the Interior Donald Hodel delayed approving that rate. After the Navajo were allegedly pressured into accepting a 12.5% rate in negotiations with Peabody, Secretary Hodel approved that lower rate. The Court of Federal Claims issued an opinion highly critical of the government, but did not find a breach of fiduciary duty. *See The Navajo Nation v. United States*, 46 Fed. Cl. 217 (2000). The Federal Circuit reversed, holding that the United States breached its fiduciary duty by "suppressing and concealing" the Board of Indian Affairs' decision to the detriment of Navajo interests. 263 F.3d 1325, 1332 (Fed.Cir.2001). The Supreme Court recently granted the United States' petition for certiorari, —— U.S. ——, 122 S.Ct. 2326, 153 L.Ed.2d 158 (Mem.) (2002), and scheduled the case for oral argument in tandem with *White Mountain Apache Tribe v. United States*, 249 F.3d 1364 (Fed.Cir.2001), *cert. granted by* —— U.S. ——, 122 S.Ct. 1604, 152 L.Ed.2d 619 (Apr. 22, 2002).

The instant case was filed in February 1999 by Navajo Nation against the Peabody defendants, SCE and SRP. The suit claims that the defendants conspired to improperly influence the federal government's decisions regarding the coal leases.

It alleges a violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and related claims such as breach of contract, interference with fiduciary relationship, conspiracy and fraudulent concealment. The core of the complaint is the revelation stemming from discovery received in the Court of Federal Claims case that defendants hired a lobbyist, Stanley Hulett, who met with Secretary Hodel *ex parte* and allegedly persuaded him not to approve a recommendation by the area director to raise the royalty rate to 20%.

On June 17, 1999, Navajo Nation filed its first amended complaint, naming Peabody, SCE and SRP as defendants. On September 9, 1999, all defendants filed a joint motion to dismiss the amended complaint. On the same day, SRP also filed a supplemental motion to dismiss. The defendants' joint motion was denied by the Court on March 15, 2001. On May 15, 2001, the Court issued an order granting SRP's supplemental motion to dismiss the Navajo Nation's amended complaint.

The Hopi Tribe moved to intervene in February 2000. On March 15, 2001, the Court granted the Hopi Tribe's motion to intervene. On July 3, 2001, the Court granted SRP's motion to dismiss the Hopi Tribe's claims against SRP. Thus, all claims against SRP have been dismissed.

The Court denied the remaining defendants' joint motion to dismiss the Hopi Tribe's complaint for failure to state a claim. *See* Order, Oct. 31, 2001.

## II. Plaintiffs' Motions for Restoration of Claims against SRP and SRP's Motion for Entry of Judgment

■ In its supplemental motions to dismiss, SRP argued that, as a municipal corporation and political subdivision of the State of Arizona, it could not be held liable under RICO or for punitive damages.

SRP also argued that, as a governmental entity, it was protected by the Arizona notice of claims statute and had not received the requisite prior notice of the Navajo Nation's claims. On May 15, 2001, the Court issued an order granting SRP's motion to dismiss the claims against SRP in the Navajo Nation's amended complaint. On July 3, 2001, the Court also granted SRP's motion to dismiss the Hopi Tribe's claims against SRP.

Pursuant to Fed.R.Civ.P. 54(b), "[w]hen more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

The Navajo Nation suggests that new Arizona case law should persuade the Court to reinstate the claims against SRP. Specifically, the Navajo Nation claims restoration of its claims against SRP is "appropriate because, as applied to the facts of this case, the notice of claims statute violates the equal protection and anti-abrogation clauses of the Arizona Constitution." Pl.'s Mot. for Restoration of Claims against SRP at 1. The Navajo Nation argues that the Arizona Supreme Court's decision in *Clouse v. State*, 199 Ariz. 196, 16 P.3d 757 (2001), and the "depublication" of *Hendel v. Salt River Project Agric. Improvement & Power Dist.*, No. 1 CA–CV 97–0329, 1998 WL 404489 (Ariz.Ct. App. July 21, 1998), may be read to suggest that the notice of claims statute is unconstitutional when it is extended to cover claims arising out of proprietary conduct of a political subdivision of the State. However, the Navajo Nation argued these authorities to the Court at oral argument and in their briefs prior to the Court's decision to dismiss the Nation's claims

against SRP. Thus, the Navajo Nation's motion to "restore" claims against SRP is, in essence, a motion for reconsideration.

Navajo Nation contends that the Court failed to address whether plaintiffs' complaints arose out of SRP's proprietary activities and whether application of the statute to actions arising out of proprietary activities would violate the Arizona Constitution. However, in granting SRP's motions to dismiss, the Court held that the notice of claims statute applied to SRP, citing *Stulce v. Salt River Project Agric. Improvement & Power Dist.*, 197 Ariz. 87, 3 P.3d 1007 (App.1999). *Stulce*, in addition to recognizing SRP as a political subdivision of the State, held that "the Arizona Constitution specifically empowers the legislature to enact statutes of limitations and procedures that may treat lawsuits against the state differently from other lawsuits." *Id.* at 1013. The Arizona Constitution, Arizona statutes and case law all establish that municipal entities such as SRP are entitled to notice of claims in conformance with the statute prior to filing suit. *See* Ariz.Rev.Stat. § 12–821.01(C).

No court has suggested that the Arizona notice of claims requirement is unconstitutional, or may be dependent on the type of conduct that gives rise to suit. Navajo Nation relies on *Clouse*, a case that considered the constitutionality of governmental immunity statutes under the Arizona Constitution. In *Clouse*, the plaintiffs argued that a law granting immunity to public employees acting within the scope of their employment violated the State's constitutional provision of "open courts." 16 P.3d at 758; *see* Ariz. Const. art. IV, pt. 2, § 18 ("The Legislature shall direct by law in what manner and in what courts suits may be brought against the state."). Defendants argued that the so-called "immunity clause" of the State Constitution permitted the legislature to limit the liability

of public employees. 16 P.3d at 763–64. The court held that the "immunity clause" "confers upon the legislature a power to control actions against the state that it does not possess with regard to actions against or between private parties." *Id.* at 764. Therefore, the court concluded, the legislature was acting within its authority when it enacted a law limiting the liability of public employees acting within the scope of their employment. *Id.* However, the court limited its holding to the scope of the contested legislative enactment, noting that it did "not address the liability of public entities for proprietary activity." *Id.* at 765. Nevertheless, in a recent decision of the Court of Appeals of Arizona, *Clouse* was cited for the broad proposition that the Arizona Constitution grants the legislature authority to define instances in which public entities and employees are entitled to immunity. *See Flood Control Dist. of Maricopa County v. Gaines,* 202 Ariz. 248, 43 P.3d 196, 201 (App.2002).

Ultimately, the Navajo Nation's argument rests on its mischaracterization of the notice of claims statute as an immunity statute. Navajo Nation would have this Court read *Clouse* to mean that the Arizona Supreme Court has expressed doubt that any regulation of liability arising from a public entity's proprietary activities would be constitutional. However, *Clouse* concerned the scope of a public entity's immunity from liability. 16 P.3d at 764. Here, the issue facing the Court is compliance with Arizona's notice of claims statute. This statute is more akin to a statute of limitations on claims against public entities than it is analogous to a law immunizing public entities from suit. Plaintiffs have cited no authority for the proposition that a requirement that public entities be given notice within a certain period of time may be unconstitutional under the Arizona Constitution. It is undisputed that SRP did not receive notice within the meaning of the statute. Consequently, the Court

finds no reason to revisit its decision to grant SRP's motions to dismiss.

Navajo Nation argues, in the alternative, that the Court should certify these "unsettled questions" of Arizona state law to the Arizona Supreme Court. The Court is not convinced that this matter presents an unsettled question of Arizona law. Navajo Nation's argument is based on the premise that the Arizona Supreme Court has "demonstrated reluctance to decide whether the Arizona Legislature may enact statutes limiting the circumstances under which municipal corporations may be liable for torts arising out of their proprietary activities." Pl.'s Mot. for Restoration at 2. However, the Nation points only to the Arizona Supreme Court's decision in *Clouse* to support this proposition. For the reasons stated above, the Court does not believe that *Clouse* raises significant doubts as to the constitutionality of Arizona's notice of claims statute.

SRP asks the Court to enter final judgment as to plaintiffs' claims against it. Pursuant to Fed.R.Civ.P. 54(b), the Court may enter final judgment as to an individual defendant when claims against other defendants are still pending. However, the entry of final judgment is appropriate as to "one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b).

■ SRP argues that, because the basis for the Court's dismissal of claims against SRP is inapplicable to the other defendants, the Court should enter final judgment for SRP on all claims. However, an entry of final judgment is inappropriate where, as here, issues may be raised on appeal that are common to the remaining parties and claims. *See Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 8,

100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) (noting as factors for considering whether final judgment on one of multiple claims is appropriate "judicial administrative interests" and "whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals"). While this Court has dismissed the claims against SRP on the grounds that SRP is a public entity and the plaintiffs were therefore required to comply with Arizona's notice of claims statute, SRP admits that it would not be limited to defending the dismissal on this basis. Indeed, SRP might be deemed to waive other defenses, such as those asserted in defendants' joint motion to dismiss, if it were not to raise them on appeal. Thus, while this Court has dismissed SRP from the instant litigation on grounds separate and apart from the joint defenses raised by SRP together with Peabody and CSE, SRP is likely to defend an appeal, at least in part, with arguments that are common to the remaining defendants. Consequently, the Court denies SRP's motion to enter final judgment.

### III. Motion to Transfer or Stay

The Peabody defendants request that the Court transfer this case to the District Court for the District of Arizona or, in the alternative, stay proceedings in the instant matter until the Arizona court has resolved litigation pending before it.

The lawsuit filed in the Arizona District Court concerns an arbitration clause contained in Coal Lease No. 8580 between Navajo Nation and Peabody. In 1984, an Area Director of the Bureau of Indian Affairs ("BIA"), Donald Dodge, unilaterally adjusted the royalty rate on Lease No. 8580 to a 20% rate, which was in excess of the 12.5% and lesser rates applied in other coal leases during the period of 1985 to 1996. Peabody and the operators of the two power plants, SCE and SRP, chal-

lenged the Dodge decision before the Interior Department. The rate dispute was resolved by way of negotiations that led to the amendment of the 8580 lease in 1987. The Navajo Nation Lease No. 9910 and the Hopi Tribe Lease No. 5743 were also amended in 1987.

The 1987 amendments to the three leases, No. 8580, No. 9910 and No. 5743, raised the royalty rates to 12.5%. The 1987 amendments to No. 8580 also addressed the Dodge rate determination, and the parties agreed to petition the Interior Secretary to vacate the Dodge determination and render that royalty adjustment decision to be without legal force or effect.

Article IV and VI, as amended by the 1987 Lease Amendments, set out the method for readjustment of royalty rates under Lease No. 8580 for periods beginning on and after February 1, 1984 and require that the parties engage in negotiation and then arbitration of disputes regarding the proper royalty rates. Article XXXVII, created by the 1987 amendments, describes the arbitration procedures. A three-member arbitration panel is to be created, with one member selected by each of the parties and a third member to be jointly selected by the parties. If the parties are unable to agree on a third member, they may request the Chief Judge of the Arizona District Court to appoint the third member and, if the Chief Judge is unable or unwilling to do so, the article provides that the Regional Vice–President of the American Arbitration Association for Arizona will select the third panel member.

In 1997, the Navajo Nation commenced negotiations with Peabody seeking an increase in the royalty rate. These negotiations were unsuccessful and, on February 2, 1998, the Navajo Nation tendered a formal demand for arbitration in compliance with the procedures mandated by the 1987 amendments. The parties petitioned

the Chief Judge of the Arizona District Court to select the neutral presiding arbitrator. In September 1998, the parties entered into an Arbitration Settlement Agreement and a final arbitration award was approved by the panel.

On February 21, 2002, Peabody filed a lawsuit in the Arizona District Court seeking to enforce the prior award or to compel further arbitration. *Peabody Coal Co. v. The Navajo Nation,* Civ. Action No. 02–0318 PCT RCB. Judge Broomfield has scheduled oral argument on a motion to dismiss filed by Navajo Nation.

Peabody suggests that the Court should transfer this case to the District Court for the District of Arizona for the following reasons: (1) that both Navajo Nation and Hopi have binding agreements with Peabody to arbitrate and litigate royalty rate disputes in the District of Arizona; (2) the pendency of royalty rate litigation before the Arizona District Court; (3) the applicability of Arizona law to "material issues"; and (4) "the predominance of Arizona connections, witnesses, and evidence in this case, including the ancestral home of plaintiffs." Reply at 7.

### A. Motion for Transfer

■ Defendants concede that venue in this District is proper. Accordingly, a transfer is appropriate only if it is more convenient for the parties and the witnesses and otherwise in the interests of justice. *See* 28 U.S.C. § 1404(a). The party seeking a transfer bears the burden of persuasion. *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1154 (D.C.Cir.1978).

### 1. Effect of Forum Selection Clause

■ Peabody defendants argue that this Court must enforce valid forum selection clauses. *Marra v. Papandreou,* 216 F.3d 1119, 1123 (D.C.Cir.2000). In arguing that this case is within the purview of Article XXXVII—the lease agreements' arbitration clause—Peabody defendants essentially contend that the issues presented by this litigation were resolved by the 1998 arbitration award. *See* Defs.' Reply at 18 ("during the 1998 arbitration proceedings, the Navajo Nation raised all of the facts and allegations that it would later sweep into the June 1999 amended complaint in this Court against Peabody"). Nevertheless, defendants concede that venue is proper in this Court, and, moreover, have not asserted the defense of arbitration and award in this matter. Indeed, pursuant to Fed.R.Civ.P. 8(c), a defendant must set forth affirmatively the defense of "arbitration and award." Neither Peabody nor SCE asserted this defense. Thus, while the Peabody defendants do not assert the arbitration award as a *defense* to this litigation, they essentially argue that the arbitration award concerns the matters before this Court, warranting a transfer or a stay of proceedings.

Most significantly, defendants are not arguing that the Court is required to enforce the purported forum selection clause by transferring this case to the District of Arizona. *See* Defs.' Mot. to Transfer at 6 (citing *Stewart Org., Inc.,* 487 U.S. at 29, 108 S.Ct. 2239 for proposition that forum selection clause is "significant factor" in district court's consideration of motion to transfer). Yet, a choice of forum clause that governs the subject matter being litigated is a heavy factor in favor of transfer. *See, e.g., In re Ricoh Corp.,* 870 F.2d 570, 573 (11th Cir.1989); *National Micrographics Sys., Inc. v. Canon U.S.A., Inc.,* 825 F.Supp. 671, 682 (D.N.J.1993) (forum selection clause shifted burden to plaintiff to proof that transfer was not warranted).

Peabody defendants, in their motion to transfer, do not clearly identify the forum selection clause, which they argue mandates a transfer or a stay. On one hand, they cite the 1987 Lease Amendments provision in Lease No. 8580 that "Article IV

and VI of these lease amendments shall be the sole and exclusive method for the determination or readjustment of royalty rates under Lease No. 12–40–0603–8580 for periods beginning on and after February 1, 1984."[1] Articles IV and VI provide for negotiation and binding arbitration of royalty rate determinations. These articles make no mention of the District of Arizona as the exclusive forum for contesting an arbitration award and, rather, refer to the arbitration procedures contained in Article XXXVII.

 Therefore, the Court can only assume that defendants are asserting that the new Article XXXVII, contained in paragraph 12 of the 1987 Amendments, constitutes the grounds for defendants' claim that the Lease Agreement has a "forum selection clause." Identical language is found in paragraph 12 of the 1987 Amendments for all three leases.

Paragraph 12 of the 1987 Amendments provides for the addition of a new Article XXXVII entitled "Arbitration" to the lease agreements. The new article outlines procedures for arbitration "[w]henever under the provisions of [the] Lease, as amended, arbitration is required to take place." The procedures call for the selection of three arbitrators, with the assistance of the Chief Judge of the Arizona District Court, if necessary and possible. The article further provides that an arbitration award:

> shall be presumed to be valid, and may be vacated only by the United States District Court for the District of Arizona

on one of the following grounds: (a) the decision was procured by corruption, fraud or undue means; (b) there was evident partiality or corruption by the arbitrator, arbitration panel or by any member; (c) the arbitrator, arbitration panel, or any member was guilty of misconduct in refusing to hear the question or in refusing to hear evidence pertinent and material to the question, or any other clear misbehavior by which the rights of either party have been substantially prejudiced; (d) the arbitrator, arbitration panel, or any member exceeded their authority under the terms of this Lease as amended; or (e) the arbitrator or arbitration panel's decision is contrary to law. *Lessor and its officers acting in their official capacity consent to suit in the United States for the District of Arizona, for the limited purpose of the enforcement or appeal of any arbitration decision to this article,* and agree not to raise sovereign immunity or exhaustion of tribal remedies as a defense to such a suit.

8580 Lease, ¶ 12 (emphasis added). Peabody defendants are not arguing that any of the five specified grounds are relevant to this matter. *See* Defs.' Reply at 10.

 The Navajo Nation asserts that the arbitration clause in paragraph 12 applies only to actions for the "enforcement or appeal" of any arbitration decision, and that the Nation's claims in this case are not brought to enforce or appeal an arbitration decision.[2] A forum selection clause

---

1. The quoted language is not found in Leases Nos. 9910 and 5743.

2. The Navajo Nation also argues that this paragraph cannot be labeled a forum selection clause because the clause does not specify that *all* disputes be litigated in the District of Arizona. Rather, contends the Nation, the clause is a limited waiver of sovereign immunity. In other words, it is an agreement by the Navajo Nation not to require Peabody to

exhaust tribal remedies before bringing an action to enforce or appeal an arbitration decision. Thus, Navajo Nation would have this Court read the clause as a one-way street, permitting Peabody to bring suit in the District of Arizona, but not limiting the forums in which the Navajo Nation may institute litigation. Because the Court finds that the instant lawsuit does not lie within the scope of the purported forum selection clause, the Court

is only relevant to the Court's transfer analysis to the extent that the "clause applies to the type of claims asserted in the lawsuit." *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692 (8th Cir.1997); *see also S–Fer Int'l, Inc. v. Paladion Partners, Ltd.*, 906 F.Supp. 211, 214 (S.D.N.Y. 1995) (if plaintiff's claims do not fall within terms of forum selection clause, the clause cannot support a transfer of venue).

In responding to the Navajo Nation's argument, Peabody defendants rely on language in Article VI that is arguably broader than that in Article XXXVII. Article VI mandates that Articles IV and VI of the Lease Amendments are the "sole and exclusive method for the determination or readjustment of royalty rates" under Lease No. 8580. However, Articles IV and VI simply state that arbitration shall proceed pursuant to Article XXXVII. Thus, Article VI suggests that any determination or readjustment of royalty rates must be subject to arbitration procedures. Yet, the arbitration procedures require only that enforcement or appeal of an arbitration award be brought in the District of Arizona. The arbitration clause does not state, for example, that any action that would result in a readjustment of royalty rates must be brought in the District of Arizona. Rather, the forum selection clause (logically) applies only to actions challenging *arbitration awards*—seeking to enforce or appeal the award. Indeed, Article XXXVII applies only "[w]henever . . . arbitration is required to take place." The arbitration mandated by Article IV and VI occurs at the conclusion of a ten-year period, after which the royalty rate may be readjusted. Thus, the provisions of Article XXXVII apply only to the arbitration proceedings and subsequent award in 1998. The forum selection clause does not apply to other litigation that may or may not have an effect on the royalty rates.

need not reach the issue of whether the clause

Peabody attempts to argue that the Court should look beyond the substance of the Nation's complaint and view the instant litigation as a request for a "determination or readjustment" of the royalty rates at issue. *See, e.g.*, Reply at 6 ("The lawsuit before this Court seeks yet another determination of the royalty rates applicable to the Coal Leases from February 1984 to present."); *id.* at 1 ("While characterized as an action for damages, in reality, the Navajo Nation's suit in this Court is nothing more than an attempt to avoid their contractual commitment to negotiation and arbitration in Phoenix, Arizona as the 'sole and exclusive method' for . determining or adjusting royalty rates under the relevant Coal Lease."). However, in this case, Navajo Nation alleges that defendants conspired to improperly influence the federal government's decisions regarding the leases. Defendants thus would convert the Navajo Nation's RICO, federal trust, tort and contract claims into a singular challenge to the 12.5% royalty rate.

Peabody defendants are hard put to argue that the instant lawsuit, brought pursuant to RICO, falls within the scope of the Lease Agreement's arbitration provisions. The Nation does seek a declaration that, because of the alleged RICO violations, the current royalty rates are "voidable" and that the Nation is entitled to "reformation" of Lease Nos. 8580 and 9910. Am. Compl. at ¶ 79. However, that the remedy sought may affect the arbitration award does not change the fact that the Navajo Nation's claims arise under RICO and trust law, and do not seek to enforce or appeal the arbitration decision.

### 2. Effect of Forum Selection Clause on Claims Arising out of Lease Nos. 9910 and 5743.

To the extent that the Peabody defendants argue that the Arizona District

applies equally to both parties.

Court's limited involvement in the 1998 Peabody/Navajo arbitration regarding Lease No. 8580 and Peabody's recently-filed suit against the Navajo Nation purportedly to enforce that arbitration weigh in favor of transfer, such considerations are inapplicable to Lease Nos. 9910 and 5743. There are no arbitration awards that Peabody may seek to enforce with respect to the Hopi lease or Navajo Lease No. 9910.

Furthermore, to the extent that the Hopi Lease and Navajo Lease No. 9910 do not contain language stating that the arbitration provisions of the lease agreement constitute the "sole and exclusive" means of determining or adjusting the royalty rates, Peabody's arguments for transfer of this entire matter are all the less persuasive.

### 3. Waiver

 Even if the arbitration clause in the lease agreements between Navajo Nation and Hopi and Peabody covered the subject of the instant litigation, Peabody would appear to have waived any right to insist on further arbitration proceedings in Arizona. The contention that this Court should transfer a case filed almost three years ago because defendants have recently filed a lawsuit in the Arizona District Court must fail to the extent that the Court is not convinced by Peabody's argument that this matter is covered by the lease agreements' arbitration clauses. Thus, the Court need not reach the issue of whether the Peabody defendants have waived the right to enforce the clause.

 Nevertheless, the Court notes that Peabody has clearly acted in a manner inconsistent with its assertion that the exclusive forum for litigation is in Arizona.[3] It is apparent to the Court that Peabody

filed its motion to transfer or stay at least in part in an attempt to further delay discovery in this matter. A party to an arbitration agreement may not "manipulate the legal process" by first participating in litigation and then seeking to stay that litigation to enforce a previously disregarded arbitration right. *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons, Inc.,* 821 F.2d 772, 776 (D.C.Cir. 1987).

### 4. Peabody's Other Arguments for Transfer are Unpersuasive

 The Court's analysis of a transfer motion is grounded in an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). Courts may take account of a number of private and public considerations. The private interests that may factor into a court's decision include the plaintiff's choice of forum, the defendant's choice of forum, the forum in which the claim arose, the convenience of parties, witnesses and the ease of access to sources of proof. *The Wilderness Society v. Babbitt,* 104 F.Supp.2d 10, 12 (D.D.C. 2000). Public interest considerations include the relative familiarity of the two forums' courts with the governing law, the courts' relative calendar congestion and the relative public interests in having the controversy decided in the given forum. *Id.*

 This case is the first-filed action and, as such, should be given priority over a later-filed action. *See Columbia Plaza Corp. v. Security Nat'l Bank,* 525 F.2d 620, 627 (D.C.Cir.1975). Furthermore, none of the traditional factors weighing in favor of transfer are present in this case.

---

3. The existence of the arbitration award is in no way a "new" development in this case. In fact, Peabody referred to the arbitration award in its motion to dismiss the Navajo Nation's amended complaint.

Although defendants argue that a transfer would be in the interests of judicial efficiency, this case has been pending in this Court for almost three years, during which time the Court has considered and resolved a variety of potentially dispositive motions and discovery disputes. In contrast, Peabody filed suit in Arizona only in February, 2002. In addition, although defendants argue that plaintiffs' "home forum" is the District of Arizona, the home forum of the Hopi Tribe and the Navajo Nation are, of course, their respective tribal courts. *See, e.g., Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Housing Auth.*, 207 F.3d 21, 27 (1st Cir.2000).

Peabody further suggests that a transfer to the District of Arizona to allow consolidation with Peabody's newly filed action to enforce the 1988 arbitration award would serve judicial efficiency because this case involves questions of state law. However, the bulk of claims at issue here are governed by federal law, not by Arizona law. While Peabody defendants make much of the Navajo Nation's contention that the question of SRP's dismissal may be governed by Arizona law, this issue is wholly separate from the claims against the Peabody defendants.

### B. Motion to Stay

 Under section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, a federal court must stay litigation of a case that is referable to arbitration. *Nat'l Railroad Passenger v. Consolidated Rail Corp.*, 892 F.2d 1066, 1069 (D.C.Cir.1990). However, Peabody is not arguing that this case should be referred to arbitration, and has not raised arbitration as a defense to plaintiffs' claims. Indeed, Peabody, in its motion to dismiss, cited the arbitration award as evidence that the Navajo Nation considered the royalty rate of 12.5% to be reasonable, and argued that the Navajo Nation had failed to plead that it would not have agreed to the arbitration award absent the alleged conspiracy. The Court, therefore, finds that there is no basis for a stay.

This motion has resulted in extensive briefing and a delay of discovery. In the future, the Court will not entertain the filing of frivolous motions designed to delay litigation of this matter and, if necessary, will impose appropriate sanctions. *See* Fed.R.Civ.P. 11.

### IV. Motions for Entry of Protective Order

Pending before the Court are two motions for entry of protective order, filed on behalf of the Peabody defendants and SCE. The Navajo Nation and the Hopi Tribe have submitted a joint request for oral argument on the pending motions for protective orders.

Peabody's motion for a protective order addresses plaintiffs' contention that prior production of documents pursuant to a protective order in the Court of Federal Claims litigation operates as a waiver of any privilege claim in this case. The documents at issue concern communications among Peabody counsel concerning the coal lease negotiations between Peabody and the Navajo Nation, and Peabody seeks now to assert attorney-client and attorney work product privileges for these documents.

Similarly, SCE seeks to assert attorney-client and attorney work product privileges for documents produced to the Navajo Nation pursuant to a third-party subpoena in the Court of Federal Claims litigation.

### A. Background

The instant discovery dispute stems from a long and complicated history of discovery disputes in the Court of Federal Claims. In the course of the Court of Federal Claims proceedings, the Navajo

Nation subpoenaed documents relating to the lease negotiations of the 1980s from Peabody and from the coal customers, SCE and SRP. In order to facilitate discovery, a Confidentiality and Protective Order ("CAPO") was negotiated by the United States, the Navajo Nation, Peabody, SRP and SCE. This CAPO was endorsed by the Court of Federal Claims on February 12, 1996 and, in paragraph 17, provides in full:

> Neither Peabody, Salt River Project, or Southern California Edison hereby waives its attorney-client privilege or attorney work-product privilege with respect to any document that might otherwise be subject to disclosure pursuant to this Protective Order. If Peabody, Salt River Project or Southern California Edison determines to claim such privilege, it shall furnish the Navajo Nation and the United States, no later than February 16, 1996, with a list of those documents for which the privilege is claimed, stating the author, all addressees and recipients including those receiving or listed as receiving copies, date and a general description of all subjects raised or discussed in the document and any attachments thereto for which the privilege is claimed. Such description shall include sufficient detail for the parties to evaluate the propriety of the claim of privilege.

Peabody declined to produce numerous responsive documents on the grounds that they were privileged or subject to work product protection. Navajo Nation filed an opposed motion to compel Peabody to produce these documents. At a hearing on the motion in front of the Honorable Bohdan A. Futey of the Court of Federal Claims, Peabody and Navajo Nation agreed, with the approval of the Court, to production of the documents subject to an agreement. The Court of Federal Claims subsequently described the oral argument on the motion to compel:

> At oral argument the parties agreed that Peabody would release all non-privileged documents presently in dispute.... The Court warned that Peabody would be permitted to assert privilege only by fully describing the withheld documents and explaining how they fit within the privilege claimed.

*Navajo Nation v. United States*, 46 Fed. Cl. 353, 355 (2000).

The parties' agreement was embodied in an order and stipulation dated November 7, 1996 and November 19, 1996 respectively, and provided that production of the documents would not constitute a waiver of any privilege for purposes of other proceedings. The November 7, 1996 order further provides:

> Peabody may stamp the documents "confidential" prior to their production. If necessary, Peabody may assert claims of privilege with regard to certain documents. Peabody shall describe these documents and provide an explanation of how the documents fit within the privilege claimed. Production of documents for purposes of the present case shall no constitute a waiver of any right of Peabody to raise a claim of privilege as to these documents in any other present or future proceeding.

The stipulation signed by the parties had a similar clause stating that the parties agreed that "production of any of the documents presently in dispute shall not constitute a waiver of any privilege of Peabody or any of its affiliates, subsidiaries, or related companies that may be asserted in any other present or future litigation." Furthermore, the stipulation called for the review and copying of all documents in dispute by counsel for the United States and the Navajo Nation, with the exception of those documents that Peabody considered so commercially sensitive that its review by either counsel would bar counsel from participating in future reopener ne-

gotiations. From all appearances, this agreement was upheld by counsel for the Navajo Nation and for Peabody throughout discovery in the CFC case.

On November 22, 1996, pursuant to the procedures set out by November 7, 1996 order, Peabody submitted a privilege log designating fourteen documents that it wished to withhold from production because of confidentiality, attorney-client privilege, or work product protection reasons.

When the Navajo Nation filed its lawsuit in this Court on February 6, 1999, the complaint was filed *ex parte* and under seal. When, on June 9, 1999, the Navajo Nation filed an amended, public version of the complaint, it asserted that it was relying only on documents and information not subject to the CAPO. Upon realizing that the first, sealed complaint might have utilized CAPO documents, Peabody moved the Court of Federal Claims for a contempt finding.

In a March 31, 2000 memorandum opinion, the Court of Federal Claims addressed the Peabody's contempt motion. 46 Fed.Cl. at 354. After the Navajo Nation's counsel conceded that the sealed complaint relied upon Peabody's materials disclosing the *ex parte* contacts with Secretary Hodel, the court considered whether the Nation had breached the CAPO. The court rejected the Navajo Nation's argument that the documents were not covered by the CAPO because they had been produced by Peabody. The court suggested that the Navajo Nation was "ignor[ing] what ha[d] gone before," namely, the negotiation of the CAPO and Court's approval of the agreement. The court described

Peabody's ongoing resistance to production of documents responsive to the Navajo Nation's subpoenas, noting that:

It was not always clear whether Peabody objected to production of documents on the basis of privilege (whether attorney/client or attorney work product) or because it considered the material proprietary in nature.

*Id.* at 355. Furthermore, the court noted that Peabody did not seem to be "concerned with public disclosure of the documents" insofar as the documents had been freely used in the briefing and argument of the merits, and were part of the public record. *Id.* at 357.

The Court of Federal Claims found that "the text of the CAPO does not contemplate the coverage of *privileged* material," reasoning that the CAPO was clearly concerned with protection of proprietary information. *Id.* at 359 (emphasis in original). The court distinguished protection afforded proprietary information "from that afforded privileged information, where it is not simply disclosure to the public that is to be avoided, but disclosure to the demanding party." *Id.* at 360. The court specifically cited to Paragraph 17 of the CAPO to illustrate that the agreement provided alternative means of preventing disclosure of privileged work product or attorney-client communications. *Id.* ("There is never a doubt that privilege claims are independent of the CAPO."). Accordingly, the court held that Peabody had made an "informed decision" when it released the Sullivan memorandum in its entirety that the contents were either not privileged or that Peabody would waive the privilege. *Id.* at 360.[4] In addition, the

---

4. Peabody does not here assert privilege with respect to the Sullivan memorandum and states that its "motion for a protective order does *not* include the Sullivan memorandum." Peabody Reply to Mot. for Protective Order, at 4. However, the Court notes that the Feder-

al Circuit held that the Navajo Nation's use of the Sullivan memorandum outside of its litigation with the United States was in violation of a court order. *Navajo Nation v. United States*, No. 00–5072, 2001 WL 312117, at *4 (Fed.Cir. Mar.29, 2001).

court hinted that "Peabody cannot argue convincingly that matters it considered confidential and privileged during discovery in 1997 remain so today." *Id.* (noting that this Court might agree). Finally, on July 7, 2000, after further briefing by the parties, the Court of Federal Claims released to the public record additional documents for which Peabody had sought protection.

SCE was not a party to the Court of Federal Claims' November 1996 order and stipulation governing discovery disputes between the Navajo Nation and Peabody. However, SCE notes that, in an exchange of correspondence between counsel to the Navajo Nation and counsel for SCE, the Navajo Nation agreed that "any and all documents being produced are pursuant to the understanding ... that Edison is not waiving any of its claims of privilege which could be asserted as to the documents or the subject matter involved." *See* Letter from Larry Cope to Paul Frye dated Sept. 25, 1996.

On July 23, 2001, this Court entered an Order and Stipulation submitted by the parties that directed defendants to obtain copies of the documents produced in the Court of Federal Claims litigation from the Navajo Nation, and to create a privilege log. The Peabody defendants and SCE have tendered privilege logs addressing individual privilege assertions with respect to specific documents. The Navajo Nation and Hopi Tribe seek to discover documents, for which the defendants have asserted claims of attorney-client privilege and attorney work product in this case, but which were disclosed in the Court of Federal Claims litigation. Consequently, Peabody and SCE seek protective orders that would permit them to withhold the contested documents.

## B. Privilege Claims

As an initial matter, the Court notes that neither Peabody nor SCE attaches a copy of their privilege logs. Rather, both defendants pose the issue broadly as whether "all privilege claims have been waived as to all documents produced in the CFC proceedings by the defendants." Peabody Mot. to Compel at 2, n. 1.

 A valid claim of privilege is sufficient good cause to justify a protective order. *Pearson v. Miller,* 211 F.3d 57, 65 (3d Cir.2000). Thus, the Court must consider whether the defendants can assert valid claims of attorney-client and attorney work product privilege for documents that have been released to the Navajo Nation in the course of the Court of Federal Claims proceedings.

### 1. Attorney–Client Privilege

Interestingly, none of the parties to this dispute distinguishes between documents that may be protected by attorney-client privilege and those subject to the attorney work product doctrine. Yet, the D.C. Circuit precedent clearly distinguishes between these two claims of privilege and the Court will analyze the issues raised by these privileges in turn.

The D.C. Circuit has consistently rejected the concept of a "limited waiver." *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981). The court has rebuffed the notion that a client may waive the attorney-client privilege "in circumstances where disclosure might be beneficial while maintaining it in other circumstances where nondisclosure would be beneficial." *In re Subpoenas Duces Tecum (Fulbright & Jaworski),* 738 F.2d 1367, 1370 (D.C.Cir.1984); *see also Permian,* 665 F.2d at 1222 ("We believe that the attorney-client privilege should be available only at the traditional price: a liti-

gant who wishes to assert confidentiality must maintain genuine confidentiality.").

The Navajo Nation is clearly bound by the terms of the CAPO, to which it is a party. The CAPO and stipulation expressly state that disclosure of documents in that case will not waive privileges "in any other present or future litigation." [5] However, as the Court of Federal Claims noted, paragraph 17 of the CAPO clearly outlines procedures for claiming that documents are protected by attorney-client privilege or are attorney work product. The CAPO does *not* require that such documents be produced and, rather, permits the parties to provide a factual, non-privileged proffer regarding the documents' contents. This Court is persuaded by the Court of Federal Claims' interpretation of the CAPO. That court held that the CAPO's production provisions did not apply to privileged documents. 46 Fed.Cl. at 360; *see also Navajo Nation v. Peabody Coal Co.,* 7 Fed.Appx. 951, 956, 2001 WL 312117 (Fed.Cir.2001) ("The CAPO was not meant to provide similar protection for privileged information.... Notably, the CAPO referred to confidential and privileged information as two separate categories of information...."). [6] Thus, Peabody and SCE have waived any attorney-client privilege for documents produced pursuant to the CAPO.

In noting that there was "no doubt" that the CAPO did *not* apply to privilege claims, the Court of Federal Claims cited to the resolution of the November 1996 discovery disputes between Peabody and the Navajo Nation, which stemmed from Peabody's assertion that certain docu-

ments were privileged. *Id.* Thus, in November 1996, the Court of Federal Claims was squarely presented with the need to resolve a privilege dispute that fell outside the CAPO's guidelines for protection of confidential, proprietary information. The court's November 7, 1996 order, and the subsequent stipulation signed by the parties, were intended to implement procedures that would resolve the privilege issue. In its March 31, 2000 opinion, the court suggested that "[c]learly, claims in other fora are implicated by [the November 7, 1996] order," which provided that a waiver of privilege for purposes of the Court of Federal Claims litigation would not constitute a waiver of privilege in other cases.

■ Thus, this Court faces the issue of whether the November 1996 order and stipulation constituted an effective non-waiver agreement. This inquiry, however, is made more complicated by subsequent events in the Court of Federal Claims case. It would appear that many of the documents that Peabody released to the Navajo Nation pursuant to the November 1996 order and stipulation may have been included in public pleadings and referred to in oral argument. Yet, given the nature of the pleadings currently before it, the Court cannot ascertain whether all—or none—of the documents for which Peabody asserts privilege have, in some manner, been subsequently released to the public. To the extent that these documents have been made public, any claim of confidentiality and privilege clearly must fail. With respect to material released by

---

5. SCE is a party to the CAPO, but not the November 1996 stipulation, a distinction that the Hopi Tribe suggests is fatal to SCE's motion for a protective order. However, the Court need not reach this issue because it finds that production of documents pursuant to the CAPO constituted a waiver the claimed privileges.

6. Similarly, the Federal Circuit noted that the November 1996 order and stipulation focused on the disclosure of *privileged* documents, and "did not change the CAPO's purpose" of protecting *proprietary* information. 7 Fed.Appx. at 956, 2001 WL 312117.

Peabody pursuant to the November 1996 order and stipulation that has not been released to the public, the Court turns to the governing precedent on waiver of attorney-client privilege.

 Peabody argues that the November 1996 order and stipulation effectively protected any attorney-client privilege despite Peabody's disclosure of documents. However, "[i]n the attorney-client context, [the D.C. Circuit] adheres to a strict rule on waiver of privileges." *SEC v. Lavin,* 111 F.3d 921, 929 (D.C.Cir.1997). The D.C. Circuit has consistently rejected the validity of "limited waiver" agreements. In *Permian,* and again in *In re Subpoenas Duces Tecum (Fulbright & Jaworski),* the D.C. Circuit held that a party that had voluntarily produced documents to the SEC in hopes of receiving quicker SEC approval had waived attorney-client privilege with respect to those documents. 665 F.2d at 1216, 738 F.2d at 1370. Here, Peabody chose to disclose privileged material in the Court of Federal Claims proceeding. Indeed, the Court of Federal Claims found that, even given the existence of the CAPO and the November 1996 order and stipulation, Peabody made an informed decision in releasing the Sullivan memorandum—"that either the contents were not privileged or that any privilege was no longer worth pursuing." 46 Fed.Cl. 353.

Peabody argues that its production of other documents was protected by the November 1996 court order and stipulation, and is thus distinguishable from the voluntary production in *Permian* and *In re Subpoenas Duces Tecum.* No D.C. Circuit case discusses the effect of a court-approved non-waiver agreement. However, the Circuit's discussion in *In re Sealed Case* is instructive on this matter. 877 F.2d 976 (D.C.Cir.1989). In that case, a company had inadvertently disclosed a document to the Internal Revenue Service.

In response to the government's argument that any attorney-client privilege had been waived by this accidental production, the company contended that the disclosure had not been "voluntary" because it was "a bureaucratic error." *Id.* at 980. The Circuit held that the nature of the disclosure—whether "voluntary" or "inadvertent"—was not outcome determinative, and refused to "distinguish between various degrees of 'voluntariness' in waivers of the attorney-client privilege." *Id.* Rather, the Circuit warned holders of privilege that they must "jealously guard[ ]" that privilege "lest it be waived." *Id.* Here, Peabody's disclosure was not inadvertent. Yet, neither was it "involuntary." *See Westinghouse Electric Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1427 n. 14 (3d Cir.1991) (considering disclosure prompted by grand jury subpoena to be voluntary where party moved to quash the subpoena but later withdrew the motion and produced documents pursuant to confidentiality agreement); *cf. Lavin,* 111 F.3d at 930 (describing as involuntary those "disclosures by third parties over whom the holder of the privilege has virtually no control"). Under governing precedent, this Court can not but find that Peabody has waived attorney-client privilege with respect to documents disclosed to the United States and the Navajo Nation by Peabody, whether pursuant to the CAPO or the November 1996 order and stipulation.

Disclosure of the privileged documents breached any "genuine confidentiality," necessary to maintain a claim of attorney-client privilege. 665 F.2d at 1222; *see also Westinghouse,* 951 F.2d at 1427 (where stipulated court order memorialized confidentiality agreement, court noted that, "under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third

party agrees not to disclose the communications to anyone else.").

Furthermore, a consistent policy consideration that runs throughout the D.C. Circuit cases is the sense that parties should not be permitted to disclose documents for tactical purposes in one context, and then claim attorney-client privilege in another context. *See, e.g., In re Subpoenas Duces Tecum*, 738 F.2d at 1370; *Permian Corp.*, 665 F.2d at 1222. This Court will not undertake to examine whether Peabody's decision to disclose documents in the Court of Federal Claims litigation was, in fact, a "benefit" to the company; it is enough that the disclosure was a strategic decision made by Peabody. Peabody has waived its attorney-client privilege with respect to documents produced to the Navajo Nation and the United States in the Court of Federal Claims case.

SCE's claims of privilege arise under the CAPO and correspondence between counsel. As discussed above, any claim of privilege for documents released pursuant to the CAPO, for which the procedures of Paragraph 17 of the CAPO were not invoked, must fail. Furthermore, SCE's attempt to forge from counsel's correspondence an analogy to the November 1996 order and stipulation governing release of Peabody's materials is unconvincing. Accordingly, SCE's motion for a protective order for privileged documents produced in the course of the Court of Federal Claims litigation is denied.

### 2. Attorney Work Product Protection

As an initial matter, the Court again notes that the parties have failed to distinguish between documents for which the defendants are asserting work product protection and those for which they claim

attorney-client privilege. The work product protection is arguably broader than the attorney-client privilege because it applies to material "obtained or prepared by an adversary's counsel" in the course of his or her legal duties that was done "with an eye toward litigation." *In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982). The D.C. Circuit has held that, "because it looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, the work product privilege is not automatically waived by any disclosure to a third party." *Id.*

■ The D.C. Circuit has identified three factors for considering whether the attorney work product privilege has been waived: "(1) the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege . . .; (2) appellants had no reasonable basis for believing that the disclosed materials would be kept confidential by the [third party]; and (3) waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege." *In re Subpoenas Duces Tecum*, 738 F.2d at 1372 (internal citations omitted).

■ In considering the first factor, the D.C. Circuit noted that, where documents had been initially disclosed to an adversary, the SEC, the privilege holder could not assert work product privilege against "different adversaries." *Id.* at 1372. Similarly, Peabody and SCE have disclosed the documents at issue not only to an adversary—but to one of the *same* adversaries, from whom they now seek to withhold the documents.[7] As the Circuit concluded, "[i]t would . . . be inconsistent and unfair to allow [the party asserting privilege] to select according to their own self-

---

7. This is clearly not a case where there are "common interests between transferor and transferee," *United States v. AT & T*, 642 F.2d 1285, 1299 (1980), which might create an expectation of confidentiality.

interest to which adversaries they will allow access to the materials." *Id.* Furthermore, disclosure of the material already produced in the Court of Federal Claims case would not detract from a healthy, adversarial system. *See Hickman v. Taylor,* 329 U.S. 495, 509–12, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *In re Subpoenas Duces Tecum,* 738 F.2d at 1375.

The only factor that appears to weigh in favor of issuing a protective order for attorney work product materials produced in the Court of Federal Claims litigation is defendants' "reasonable" belief that they had not waived this privilege. In *Permian,* the D.C. Circuit upheld the District Court's finding that no attorney work product waiver had occurred for documents where a special agreement with the SEC established a protective attitude of confidentiality. At least as concerns Peabody's disclosure of documents, the November 1997 order and stipulation clearly intended that privileges would not be waived. However, this factor must be considered in tandem with the others. D.C. Circuit precedent is clear that "the [work product] privilege does not protect against the manipulation of selecting a particular opponent for selective disclosure—most probably for the discloser's own benefit." 738 F.2d at 1375. Here, to find that Peabody or SCE had maintained their attorney work product privilege after disclosing documents to the same adversary, Navajo Nation, thus limiting Navajo Nation's use of the disclosed documents to one forum and one lawsuit (to which the defendants were not parties), would afford more than mere protection to defendants' trial preparation against its opponents; it would encourage legal maneuvering and inure to the detriment of a "healthy" adversarial system. Accordingly, the Court finds that Peabody and SCE have waived their attorney work product privilege in those documents that were disclosed in the Court of Federal Claims litigation.

### 3. Hopi Tribe's Objections to Protective Order

The Hopi Tribe asserts that it was not a party to the CAPO or the November 1996 stipulation, and that defendants' voluntary disclosure of documents to the Navajo Nation and the United States during the course of the Court of Federal Claims litigation waived any such claims of privilege with respect to the Hopi Tribe. The Court need not reach the question of whether a "non-waiver" agreement is effective against a party not bound by that agreement because it finds that Peabody and SCE have waived their attorney-client and attorney work product privileges with respect to documents produced in the CFC litigation.

### 4. Conclusion

The Court is at a disadvantage in resolving this discovery dispute because the defendants have failed to adequately describe the information for which they seek a protective order. However, to the extent that the Court of Federal Claims released to the public record numerous documents that were produced by Peabody under the CAPO, and found that Peabody had, to a large extent, "slept on its CAPO rights," 46 Fed.Cl. at 357, the Court is not inclined to impose a sweeping protective order that would essentially reinstate privileges for documents that have been released to the public. The Court thus finds that Peabody and SCE have waived their privileges with respect to any documents that have been made part of the public record of the Court of Federal Claims case.

Ultimately, the CAPO, as well as the subsequent order and stipulation, suggest that Peabody and SCE could withhold, or redact, documents that contained attorney-client communications or attorney work product. To the extent that the defendants withheld documents in this manner,

and did not release them to the Navajo Nation and the United States, the defendants are clearly in the position to continue to assert these privileges. However, the defendants have waived attorney-client and attorney work product privileges with respect to those documents that were disclosed to the Navajo Nation and the United States in the course of the Court of Federal Claims litigation. Accordingly, the defendants' motions for protective orders are denied.

## CONCLUSION

For the foregoing reasons and upon careful consideration of the pending motions, including SCE's motion for entry of judgment, plaintiffs' motions for restoration of claims against SCE, Peabody defendants' motion for transfer or a stay, and the defendants' motions for entry of a protective order, the oppositions and replies thereto, the entire record herein and the applicable statutory and case law, it is hereby

**ORDERED** that Salt River Project's motion for entry of judgment [163–1] is **DENIED**; and it is

**FURTHER ORDERED** that Navajo Nation's motion for restoration of claims against Salt River Project [148–1] is **DENIED**; and it is

**FURTHER ORDERED** that the Hopi Tribe's motion for restoration of claims against Salt River Project [155–1] is **DENIED**; and it is

**FURTHER ORDERED** that Peabody defendants' motion for transfer or, in the alternative, for a stay [198–1], joined by Southern California Edison [190–1] [209–1], is **DENIED**; and it is

**FURTHER ORDERED** that Peabody defendants' motion for entry of a protective order [150–1] and Southern California Edison's motion for entry of a protective order [151–1] are **DENIED**; and it is

**FURTHER ORDERED** that plaintiffs' joint motion for oral argument on defendants' motions for entry of a protective order [180–1] is **DENIED**; and it is

**FURTHER ORDERED** that the joint motion for a status hearing [218–1] is **DENIED**.

**IT IS SO ORDERED.**